PSI ENERGY, INC., Plaintiff,

v.

EXXON COAL USA, INC., and Exxon Corporation through its division Exxon Coal and Mineral Company, Defendant.

No. IP 92–645–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Aug. 27, 1993.

Robert F. Zoccola, Michael A. Bergin, Thomas L. Davis, and Alan S. Brown, Locke Reynolds Boyd & Weissell, Indianapolis, IN, and Donald P. Bogard, PSI Energy, Inc., Plainfield, IN, for plaintiff.

Richard Wilson, Fulbright & Jaworski, David J. Beck, Beck Redden & Secrest, Houston, TX, Robert A. Burgoyne, Fulbright

---

& Jaworski, Washington, DC, and William P. Wooden, John D. Nell, and Julie Michaelis, Wooden McLaughlin & Sterner, Indianapolis, IN, for Exxon Coal USA and Exxon Corp.

James K. Wilson and James J. McGowan, Jr., Exxon Coal and Minerals Co., Houston, TX, for Exxon Coal and Minerals Corp.

## ENTRY

BARKER, District Judge.

PSI Energy, Inc. ("PSI") and Exxon are signatories to a twenty-five year contract (the "Contract") which requires Exxon to supply coal to PSI through the year 2001, subject to the parties agreeing at five-year intervals to a new base price (the "Base") and escalation provisions ("Exhibit A") which together determine the actual price of the coal (the "Price"). The last renegotiation period ended on December 31, 1992. Long before that deadline, however, the parties realized that they were unable to agree on the meaning of Article VII to the Contract (the "reopener provision"), which governs re-negotiation of the coal's price. Especially troublesome to the parties was Section 7.03, which states in pertinent part:

> Each party covenants with the other to participate in such negotiations in a good faith effort to reach agreement. If the parties are unable to reach agreement, BUYER will accept SELLER's last offer or present SELLER with a firm, written offer which it has received from another supplier, which it is willing to accept, for the supply of coal called for under the remaining term of this Agreement (herein referred to as a "competitive offer").... If ... the parties have not reached agree-ment upon a new base and SELLER de-clines to meet a competitive offer submit-ted by BUYER pursuant to the above provisions, this Agreement shall terminate at the end of the contract period in which notice of price renegotiation was given....

Plaintiff's Exhibit 1. Because the parties were unable to reach agreement, PSI pre-sented Exxon with what it believed was a competitive offer from the Black Beauty Coal Company ("Black Beauty"). The terms of the Black Beauty offer differed in many re-spects from the terms of the Contract. From Exxon's perspective, the most signifi-cant difference was Black Beauty's willing-ness to supply more than one PSI station from several of its mines, which Exxon con-tended prevented it from calculating a single base that it could meet. Exxon had always supplied just one PSI station—the Gibson Station in East Mount Carmel, Indiana—from its Monterey No. 2 Mine and had built that facility at a cost of several hundred million dollars with the understanding that its coal would be dedicated to PSI. Exxon believed that, with the exception of the base, a "competitive offer" presented under Sec-tion 7.03 had to have substantially the same terms as the Contract and that PSI was required to specify a new Base determined on a delivered basis to the Gibson Station.

In contrast, PSI read Section 7.03 as re-quiring Exxon to match all the terms and conditions of the competitive offer, or, at a minimum, match those terms that PSI deemed significant. The result of the par-ties' inability to agree was a lawsuit in which PSI asked this Court to enter a declaratory judgment that: (1) the written offer which PSI received from Black Beauty is a "com-petitive offer" within the meaning of the Contract; (2) Exxon did not meet the com-petitive offer, and therefore, the Contract shall terminate on December 31, 1992, or at PSI's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04 of the Agreement; and (3) Exx-on be prohibited from taking any action, at law, in equity, or otherwise, from enjoining or preventing or seeking to enjoin or prevent PSI from accepting and executing a new agreement for the supply of coal under the Contract. A bench trial was conducted on December 1st, 2nd, 3rd, 4th, 7th and 8th, 1992.

This Court delivered its decision on De-cember 28, 1992, granting PSI's request for declaratory relief and holding that the Con-tract was not ambiguous, that the Black Beauty offer was a "competitive offer", and that Exxon had failed to meet that offer. The Court began its analysis by noting that the primary purpose of Article VII is to manage market risk by allowing the parties

to reconcile deviations in the Contract's price with the prevailing market price. It then rejected Exxon's interpretation of the reopener provision which required that any competitive *offer mirror the terms of the Contract* with the exception of the Base. It was this Court's view that restricting competition to only a single dimension—the base—would so limit the field of firms that would be able to tender an offer that it would undermine the competitive offer process. The Court explained:

The evidence presented establishes that any given coal supplier occupies a unique market position. The competitive advantage it possesses depends on such factors as the quality of the coal it can produce, the distance that the coal must travel to the buyer, the nature of its mining operations, and other idiosyncratic variables. Not every competitive advantage, though, derives from efficiencies in the cost of production because other considerations besides cost enter into the decision calculus for the buyer. For example, the supplier's flexibility in scheduling and delivering the coal is also an important competitive dimension. *See* Masselink Depo. III, at 249. The point seems too obvious to warrant much discussion, but whether a coal buyer enters into a contract with a particular supplier depends on the totality of circumstances surrounding the contract and the overall value that it renders to the buyer. Thus, it is not impossible for a coal supplier which is situated at a farther distance from the buyer than a competitor, with an inferior quality coal, to prevail in his negotiations with the buyer by offering non-cost related concessions that offset whatever disadvantages he may face. Exxon's reading of the Agreement would foreclose any competition on *non-base terms. Such a reading not only* is inconsistent with the overriding purpose of Article VII, it also directly contradicts its express language. Article VII was included in the Agreement primarily to manage market risks. Exxon's interpretation, if adopted, would shift far too much risk onto PSI by creating a barrier to competition that few coal suppliers (*i.e.* third party competitors) could overcome. The Court can find no language in the Agreement that would warrant impeding market competition in this way.

Exxon's interpretation also betrays the parties' original intent as manifested in the words they chose to incorporate in the Agreement; "competitive", as that term is used in "competitive offer", means nothing less than fully competitive. Exxon's own reasoning supports this finding:

[a]s a practical matter neither Exxon nor any other seller could meet literally all the terms and conditions of the Black Beauty offer. *That offer contains many idiosyncratic features tailored to the unique circumstances of Black Beauty's proposed operations.* Explicit reference is made to production at and sales from each of Black Beauty's three mines, by name; different coal quality standards for each mine; different "starting prices" are quoted for each mine; and delivered prices are calculated by adding to those "starting prices" the actual transportation costs incurred on each shipment from those mines.

Defendants' Trial Brief, at 32–33 (emphasis added).

The adage, "what is good for the goose is good for the gander," applies here. Exxon is just as uniquely situated in the market as Black Beauty. Why should the Court require Black Beauty to do what Exxon correctly implies is impossible: mirror all the terms of another coal suppliers' agreement and compete just on one term, the base? Simply put, the contract does not indicate that the parties intended that the third-party competitor would have to develop its offer shackled by the limitations that Exxon now seeks to impose. Under the Agreement, PSI had the right to obtain a competitive offer from another supplier which contained terms and conditions which were different from the terms and conditions of the Agreement.

Entry, at 17–19. Although the Court recognized the long-term nature of the Contract and the extent of Exxon's capital commitments to supply the Gibson Station, it could not ignore the fact that no sensible buyer would enter into an economic relationship which would leave its resources bottled-up for a quarter-century in a venture requiring it to pay above-market prices with only a

modest hope that another firm would happen to occupy a market position that would make feasible the tender of a competitive offer.

The Court also rejected PSI's contention that Exxon was required to match all the terms of a competitive offer, as this would fail to protect Exxon's interest in maintaining predictability in the Contract's terms. The Contract was a twenty-five year contract and not five separate five-year contracts. The Court wrote:

> Pursuant to Section 7.05, Exxon need not modify anything but the Base to "meet" the competitive offer. PSI's interpretation of Section 7.03 that Exxon must match the competitive offer term for term and in kind is incorrect, as this would be contrary to the express meaning of Section 7.05. That Section states that "the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit 'A', and neither party shall inject into such negotiations, as a condition of agreement upon a new Price for the coal, any demand or request that other terms and conditions of this Agreement be altered." Because the competitive offer is not limited to base competition, as this is the only interpretation that would allow the third party competitor to bring the full range of its resources to bear in the marketplace, the meaning of Section 7.03 that Exxon "shall have the right to meet such competitive offer" means that it must be allowed to match the overall value that the competitive offer would confer on PSI. If it chose not to enter into negotiations outside of Article VII, Section 7.03 allows Exxon to offset non-base related concessions in the competitive offer with corresponding reductions in the Base.

Entry, at 21–22. Although value admittedly has a subjective component, the language of the reopener provision indicated to this Court that dialogue was to be an important part of the reopening process and that negotiations were to occur regarding how Exxon would "meet" a competitive offer. This Court found that "[n]othing in the language of Section 7.03 indicates that Exxon had the right to determine unilaterally whether it had met the competitive offer; based in part

from experience with other reopener provisions, the parties recognized the necessity of discussing the competitive offer and making adjustments in their negotiating positions accordingly. See Brister Testimony, Trial Tr. at 679; Veenstra Depo. III, at 444–451; Ashley Depo. II, at 206–08." Entry, at 12. It was this Court's opinion that if all Exxon was required to do was match a single base figure which the competitive offer would supply, there really wouldn't be much to discuss or negotiate after the competitive offer had been received. Rather, the Court believed that the parties expected to engage in bona fide negotiations even after that time.

Thus, it was the Court's view that the only reasonable interpretation of the Contract was one that would respect the legitimate expectations of both the buyer and the seller. To ensure that the competitive offer process was fully competitive, and thereby guarantee that the Contract price was in accord with the market, the Court refused to impose a requirement that competitive offers mirror the Contract's terms excepting the Base. The Court also refused to force Exxon to renegotiate an entirely new contract every five years. Exxon needed only to adjust the Base.

Exxon appealed to the Seventh Circuit Court of Appeals, which rendered its decision on April 15, 1993. Like the District Court, the Court of Appeals found that a "competitive offer" did not need to duplicate the non-price terms of the Contract and that § 7.05 entitles Exxon to match a competitive offer by changing only the Base and Exhibit A. See PSI Energy, Inc. v. Exxon Coal USA, Inc., 991 F.2d 1265, 1270–71 (7th Cir.1993). The Court of Appeals ruled, however, that the Contract contained a "latent ambiguity" resulting from "the unanticipated event . . . [of] a multi-mine competing bid, which makes the calculation of a single delivered price difficult." 991 F.2d at 1270. It also held that the District Court erred in finding that Exxon was required to modify the Base to reflect the value of the non-price elements of the competitor's bid:

> Exxon's ability to limit the competition to price, and price alone, for the kind of coal Exxon has to offer, is what makes this a

genuinely long-term contract with corresponding protection for any relationship-specific capital investments. This cannot be achieved if Exxon must match the *value* of a rival's non-price terms by reducing its Base. Moreover, the entire conception of the renegotiation and competitive bid process as a way to mark Base to market would fail if non-price aspects of rival bids had to be evaluated and reflected in the Base. How can these terms be reduced to a single price? PSI does not know, and neither do we.

991 F.2d at 1270–71. The Court of Appeals therefore reversed the District Court and remanded the case so that it could

consider arguments that it bypassed in light of its conclusion that Black Beauty's offer was 'competitive' and that Exxon had not met it. PSI maintained that Exxon did not renegotiate in good faith, as § 7.03 requires, and that Exxon's 'last offer' was $23.266 rather than $30 because the offer of $30 lacked some important terms.

991 F.2d at 1272. The Court of Appeals further . clarified the scope of the remand proceedings by way of its denial of Exxon's "Motion for Recall and Clarification of Mandate":

The language in the opinion was designed to focus the attention of the parties and the district judge on a single ultimate question: what price will be effective as the Base until the next reopening? Whether the contract itself remains in force is an issue the panel fully considered and resolved. We wrote: "Under § 7.03 [of the contract] the parties must proceed during 1993–97 using Exxon's 'last offer'." Exxon's bid of $30 per ton might be deemed not the "last offer" either because Exxon acted in bad faith in making that bid or because its offer omitted material terms; in either event $23.266 would become the "last offer."

*PSI Energy, Inc. v. Exxon Coal USA, Inc.,* No. 93–1088, slip op. at 2 (7th Cir. July 12, 1993).

In deference to the Court of Appeals' well-reasoned instructions, this Court held a hearing on July 28, 1993, to consider whether Exxon renegotiated in good faith and whether Exxon's $30 offer omitted any material terms. Having heard and considered the evidence, the Court hereby finds that Exxon failed to renegotiate in good faith as § 7.03 requires and that its offer of $30 was incomplete. The Court accordingly enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Introduction

1. Plaintiff PSI is an Indiana corporation having its principal place of business in Plainfield, Indiana.

2. Defendant Exxon Corporation is a New Jersey corporation having its principal place of business in a state other than Indiana. Defendant Exxon Coal USA, Inc. is a Delaware corporation having its principal place of business in a state other than Indiana. Exxon Coal is a subsidiary of the Exxon Corporation. Exxon Coal USA, Inc., and Exxon Corporation are hereinafter referred to collectively as "Exxon".

3. The amount in controversy in this action exceeds $50,000.00, exclusive of interest and costs.

4. On April 26, 1974, PSI, which was then known as Public Service Company of Indiana, Inc., and The Carter Oil Company ("Carter") signed a long-term Coal Sale and Purchase Agreement (the "Contract"). Pursuant to the Contract, PSI agreed to purchase, and Carter agreed to supply, certain quantities of coal each year.

5. The Contract was assigned by Carter to the Monterey Coal Company ("Monterey").

6. Exxon Coal USA, Inc. is the successor by merger to the interests of Monterey.

### The Contract

7. On February 6, 1984, the parties entered into a Contract Modification ("Modification"), which included revisions to Article VII of the Contract. Article VII is otherwise known to the parties as the "reopener".

8. Article VII of the Contract, as modified, provides:

7.01 The Price of coal delivered hereunder shall be computed from a Base of $11.07 per ton, hereafter called the "Base", and shall be determined by adding to or deducting from the Base appropriately for each price adjustment factor listed in Exhibit "A" attached hereto and as a part of this Agreement, and in accordance with the adjustment procedures there stated. The price as so determined shall be the basis for computing the compensation for deviations in the gross calorific value as provided in Article X.

7.02 *Price Renegotiation.* The Base specified above shall be subject to renegotiation as provided in this Article, with the next new Base to be effective as of January 1, 1993; and, if this Agreement continues in effect to the successive times herein specified, said Base (and any coal price agreed to pursuant to any renegotiation or competitive offering as provided for herein) shall again be subject to renegotiation, effective as of the start of the 16th contract year, and the start of the 21st contract year, all in the manner herein provided. For purposes of this Article, the first contract period started January 1, 1978, and ended December 31, 1982; the second contract period started January 1, 1983, and ends December 31, 1987; the third contract period starts January 1, 1988, and ends December 31, 1992; the fourth contract period starts January 1, 1993, and ends December 31, 1997; and the fifth contract period starts January 1, 1998, and ends December 31, 2002. For purposes of this Article, the calendar year 1978 shall be deemed the first contract year.

7.03 Either party may require renegotiation of the Base by giving to the other, at any time in the first thirty (30) days of the fourth year of any contract period except the second contract period, written notice of its desire to do so. Promptly after the giving of such notice, the parties will commence negotiations to agree upon a new Base to be effective as of commencement of the next contract period. Each party covenants with the other to participate in such negotiations in a good faith effort to reach agreement. If the parties are unable to reach agreement, BUYER will accept SELLER's last offer or present SELLER with a firm, written offer which it has received from another supplier, which it is willing to accept, for the supply of coal called for under the remaining term of this Agreement (herein referred to as a "competitive offer"). It shall also provide SELLER with documentary proof of such offer, and permit SELLER to examine all supporting data and information submitted with the offer. SELLER shall have the right to meet such competitive offer.

If, by the one hundred and eightieth day preceding the end of the contract period in which notice of price renegotiation was given, the parties have agreed upon a new Base, appropriate changes shall be made to the adjustment factors provided in Exhibit "A". The Price of coal effective at the commencement of the next contract period shall be computed from the new Base adjusted under the provisions of Exhibit "A" from the reference date of the new Base. If, by such time, the parties have not reached agreement upon a new Base and SELLER declines to meet a competitive offer submitted by BUYER pursuant to the above provisions, this Agreement shall terminate at the end of the contract period in which notice of price renegotiation was given, or at BUYER's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04.

7.04 If in any such renegotiation of Base, the parties fail to reach agreement on a new Base and if SELLER declines to meet the competitive offer, and BUYER desires SELLER to continue delivering coal, then SELLER agrees to continue deliveries under the terms and conditions of this Agreement for the period of time BUYER shall designate, but not to exceed twenty-four (24) months beyond the current contract period. The Price to be paid for such additional coal shall be determined from a new Base equal to SELLER's last Base proposed in good faith during the negotiations, adjusted under appropriate amendments to Exhibit "A", from the reference date of the new Base.

7.05 It is understood and agreed that the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit "A", and neither party shall inject into such negotiations, as a condition of agreement upon a new Price for the coal, any demand or request that other terms and conditions of this Agreement be altered.

Plaintiff's Exhibit 1.

9. The primary purpose of Article VII of the Contract is to manage market risk. *See* Brister Testimony, Trial Transcript ("Trial Tr.") at 657–58; Veenstra Depo. I, at 22. The reopener allows the parties to reconcile deviations in the contract price with the prevailing market price. *See* Brister Testimony, Trial Tr. at 657–58; Veenstra Depo. II, at 140. As the Court of Appeals explained: "The possibility of a competitive offer, which defines the current market price, propels the parties toward agreement while ensuring that, as long as it charges no more than the current market price, the seller continues to receive the business. And this is what the Exxon–PSI contract provides." *PSI Energy,* 991 F.2d at 1267.

10. Under the Modification, PSI was obligated to purchase at least 3,000,000 tons of coal annually, and Exxon was obligated to supply no more than 3,300,000 tons annually, from January 1, 1984, through December 31, 2002. *See* Contract, Contract Modification at 2.

### Negotiations Between Exxon and PSI

11. On January 7, 1991, pursuant to Section 7.03 of the Contract, PSI gave written notice to Exxon of its desire to renegotiate the Base as provided in Article VII. *See* Plaintiff's Exhibit 14.

12. Exxon made its first reopener proposal to PSI on July 17, 1991, offering an undelivered price of $20.10 per ton. Subsequent offers by Exxon proposed higher prices. On November 26, 1991, Exxon proposed an undelivered price of $25.00 per ton. *See* Plaintiff's Exhibit 35. This offer was soon withdrawn, and on December 3, 1991, Exxon proposed a delivered price to the Gibson Station of $29.60 per ton. *See* Plaintiff's Exhibit 38.

13. On April 15, 1992, Exxon Coal and PSI agreed that: (1) their positions had become polarized and that they had been unable to reach agreement pursuant to Section 7.03 of the Contract; (2) PSI would submit a competitive offer along with an Exhibit "A" to Exxon Coal as early in May, 1992, as reasonably practicable; and (3) if Exxon Coal decided to meet the competitive offer, it would do so by written notification delivered to PSI no later than 5:00 p.m., Houston time, on July 3, 1992. *See* Plaintiff's Exhibit 53.

14. In a letter to PSI dated April 28, 1992, Exxon Coal presented PSI with its last offer within the meaning of Section 7.03 of the Contract. Exxon proposed a price of $30 per ton f.o.b. Gibson Station. *See* Plaintiff's Exhibit 58. Exxon did not furnish an Exhibit A with this offer. *See* Veenstra Testimony, Hearing Transcript ("Hearing Tr."), at 79. PSI subsequently rejected Exxon's offer.

15. By May 11, 1992, PSI had received offers from three coal suppliers to furnish coal under the Contract. These offers came from the Black Beauty Coal Company, Freeman Coal Sales, and Franklin Coal Sales, *see* Veenstra Testimony, Trial Tr. at 70–71, and called for the same quantity of coal as the Contract, better quality, with penalties, lower price, and greater delivery flexibility. *See* Veenstra Testimony, Trial Tr. at 76.

16. PSI employed two mining consultants, John Sabo of Marshall Miller & Associates and Seth Schwartz of Energy Ventures Analysis, Inc., to evaluate the offers. Mr. Sabo is a mining engineer, and Mr. Schwartz is an expert on fuel contracts and pricing.

17. Based on the opinions of Messrs. Sabo and Schwartz, on May 13, 1992, PSI timely submitted to Exxon the offer from Black Beauty Coal Company as the competitive offer called for under Section 7.03.

18. Pursuant to the parties' memo of understanding of April 15, 1992, Exxon had until July 3, 1992 to meet the competitive offer.

19. On July 1, 1992, Exxon informed PSI that, based on certain assumptions, "meeting

such Black Beauty offer would require that the new 'Base' (which would become effective under Section 7.01 of the Contract on January 1, 1993) would be $23.266 per ton." *See* Plaintiff's Exhibit 77, at 2.

20. On August 13, 1992, PSI informed Exxon that in its view, "Exxon [had] declined to meet th[e] Competitive Offer" and that "PSI hereby notifies Exxon that it does not elect to receive any temporary deliveries after December 31, 1992...." Defendant's Exhibit 250.

### The Coal Market

21. Coal is not a fungible resource. Its value to a utility depends on several defining characteristics which render unique any given quantity of coal. These include sulfur, BTU, ash and water content; ash fusion temperature; hardness; and delivery factors. *See* Veenstra Testimony, Trial Tr. at 13–26.

22. The coal supplied by Exxon under the Contract has come primarily from Exxon's Monterey No. 2 Mine, located in Clinton County, Illinois, which is part of the Illinois coal basin.

23. On the average, coal produced at the Monterey No. 2 Mine and delivered to PSI yields on combustion 6.2 pounds of sulfur dioxide per million BTU's (# $SO_2$/MMBTU). Coal from the Monterey No. 2 Mine is considered "high sulfur coal."

24. The Clean Air Act (CAA) requires all states to formulate an implementation plan (a "SIP") for national primary and secondary ambient air quality standards. *See* 42 U.S.C. § 7410.

25. In 1988, pursuant to the CAA, the State of Indiana adopted a SIP for Gibson County that restricted PSI's sulfur dioxide emissions at the Gibson generating station.

26. Beginning January 1, 1992, the Gibson SIP limited $SO_2$ emissions to 3.57 pounds per million BTU, and further reduces those emissions to 3.13 pounds of $SO_2$/MMBTU on January 1, 1994. *See* Veenstra Testimony, Trial Tr. at 16.

27. In 1990, amendments were passed to the CAA, which further affected the ability of PSI and other electric utilities to burn high sulfur coal. The amendments progressively reduce the amount of sulfur dioxide which utilities may emit. Specifically, the CAA imposes system-wide emissions limits of 2.5 pounds of $SO_2$/MMBTU starting January 1, 1995, *see* 42 U.S.C.A. § 7651c (West Supp. 1992), and 1.2 pounds of $SO_2$/MMBTU starting January 1, 2000, *see* 42 U.S.C.A. § 7651d (West Supp.1992).

28. As the cost to utilities of burning high sulfur coal has increased, the market value of high sulfur coal has decreased significantly. *See* Veenstra Testimony, Trial Tr. at 21; Chancellor Testimony, Trial Tr. at 264–65. Coal from the Illinois basin has not been immune from these market forces; the price of coal from the Illinois basin has dropped steadily over the last five years, especially high sulfur coal. *See* Chancellor Testimony, Trial Tr. at 265; Schwartz Testimony, Hearing Tr., at 19; Plaintiff's Exhibit 202, Appendix B, at 1; Plaintiff's Exhibit 202, Appendix C, at 1.

29. During 1991–1992, the market price for high-sulfur coal from the Illinois basin was approximately $17 to $20 a ton. *See* Veenstra Testimony, Hearing Tr., at 55.

30. The market for large tonnages of high sulfur coal is virtually non-existent. *See* Rawl Depo. at 157.

### Exxon's Good Faith

31. In its earlier entry, this Court specifically found the PSI had negotiated with Exxon in good faith during 1991 and 1992. The Court did not reach the issue of Exxon's good faith because its findings that Black Beauty's offer was competitive and that Exxon had not met that offer made it unnecessary to address that issue.

32. As it entered into negotiations with PSI, Exxon knew that the market price for its coal at the Monterey No. 2 Mine was approximately $20 per ton. The evidence of this fact is abundant. *See, e.g.,* Plaintiff's Exhibit 203, at 3 ("Our current mine price to PSI is about $32/ton. PSI believes it can purchase coal for an equivalent of about $20/ton at No. 2 Mine. Thus, PSI expects to dramatically lower its prices for the 5–year period starting in 1993. We believe PSI's

**1438**

assessment is in the right range."); Plaintiff's Exhibit 202, Appendix B, at 3 ("The sales price is subject to renegotiation effective 1/1/93 and is expected to drop significantly at that time as it approaches a level closer to market. The sales price expected at that time ($20.50/ton) is slightly less than current operating costs ($23/ton YTD July 1990)."); Plaintiff's Exhibit 202, Appendix C, at 2; Plaintiff's Exhibit 202, Appendix D, No. 5, at 1; Plaintiff's Exhibit 205, at 2; Plaintiff's Exhibit 207, at 2; Plaintiff's Exhibit 230, at 2, 12; Plaintiff's Exhibit 235; Plaintiff's Exhibit 266, at 1.

33. The uncontroverted documentary evidence from Exxon's own files establishes that they were operating on a factual basis with respect to the market value of the coal from the Monterey No. 2 Mine which they consistently misrepresented in their dealings with PSI. *See, e.g.,* Plaintiff's Exhibit 203, at 3 (Exxon Briefing Paper on PSI and the Monterey No. 2 Mine); Plaintiff's Exhibit 202, Appendix B, at 3 (Exxon Operations Plan); Plaintiff's Exhibit 202, Appendix C, at 2 (Exxon "Long–Term" Plan); Plaintiff's Exhibit 202, Appendix D, No. 5, at 1 (Exxon Marketing Analysis); Plaintiff's Exhibit 205, at 2 (Exxon Budget Memorandum); Plaintiff's Exhibit 207, at 2 (Exxon Budget Memorandum); Plaintiff's Exhibit 230, at 2, 12 (Exxon Briefing Paper); Plaintiff's Exhibit 235 (Exxon Market Projections for Illinois High Sulfur Coal); Plaintiff's Exhibit 266, at 1 (Monterey Memo to Employees).

34. Despite what it knew about the market price for coal from the Monterey No. 2 Mine, Exxon repeatedly advised PSI that the market would support a price in excess of $30 delivered to the Gibson Station. *See* Veenstra Testimony, Hearing Tr., at 60–61; Veenstra Testimony, Trial Tr., at 68–70; Veenstra Testimony, Trial Tr., at 134–135, 136; Veenstra Testimony, Trial Tr., at 191–192, 200.

35. Thus, Exxon's representations to PSI regarding the market price of its coal were knowingly and intentionally inaccurate. *See* Schwartz Testimony, Hearing Tr., at 25; Veenstra Testimony, Hearing Tr., at 59; Veenstra Testimony, Hearing Tr., at 109–110; Veenstra Testimony, Trial Tr., at 68–70;

Veenstra Testimony, Trial Tr., at 134–135. 136; Veenstra Testimony, Trial Tr., at 191–192, 200.

36. The testimony of Wendell Ellis was in critical respects evasive and deceptive. For instance, when asked whether Exxon expected the market price for coal from the Monterey No. 2 Mine to be approximately $17–$20 per ton at the start of the next contract period, his response was: *"I would not say it [i.e. the price of $17 to $20 per ton] represented what we expected it to be; it represented what it could possibly be."* Ellis Testimony, Hearing Tr., at 151 (emphasis added). Contrary to this representation by Mr. Ellis to the Court, there is no doubt from the documentary evidence created before and during these negotiations and discussions with PSI, *supra,* that Exxon fully expected the price of coal from the Monterey No. 2 Mine to be approximately $20 at the mine, *supra.* The Court is unable to afford much credibility to the testimony of Mr. Ellis.

*Exhibit A and Exxon's $30 Offer*

37. The purpose of the reopener is to renegotiate a new Price for the Contract. *See* Veenstra Testimony, Hearing Tr., at 54. Article VII of the Contract is plainly titled, "Price and Price Renegotiation".

38. Exhibit A contains the price adjustment provisions under the Contract. *See* Schwartz Testimony, Hearing Tr., at 15.

39. The Base and Exhibit A cumulatively define the Price under the Contract. *See* Schwartz Testimony, Hearing Tr., at 15; Veenstra Testimony, Hearing Tr., at 54; *see also* Contract Section 7.01.

40. It is not possible to calculate the Price under the Contract without an accompanying Exhibit A. *See* Schwartz Testimony, Hearing Tr., at 16; Veenstra Testimony, Hearing Tr., at 74; Veenstra Testimony, Trial Tr., at 55, 58; Plaintiff's Exhibit 241.

41. Because Exxon refused or failed to provide a proposed Exhibit A to PSI, PSI was unable to calculate a Price for Exxon's coal on or after January 1, 1993, from Exxon's $30 per ton offer, Plaintiff's Exhibit 58. *See* Schwartz Testimony, Hearing Tr. at 29; Veenstra Testimony, Hearing Tr., at 74;

Veenstra Testimony Hearing Tr., at 79 and 81; Veenstra Testimony, Hearing Tr., at 89–91; Deposition of Andrew Twadelle, at 50, 122.

42. In addition, Section 7.05 of the Contract specifically requires that the parties renegotiate Exhibit A.

43. Throughout its negotiations with PSI, Exxon steadfastly refused to discuss the terms of Exhibit A. *See* Veenstra Testimony, Hearing Tr., at 78; Veenstra Testimony, Trial Tr., at 58–59; Veenstra Testimony, Trial Tr., at 75. With the exception of Exxon's offer of $29.60, Exxon refused to furnish PSI with a proposed Exhibit A. *See* Veenstra Testimony, Hearing Tr., at 75; Veenstra Testimony, Trial Tr., at 75.

44. The only Exhibit A which Exxon provided to PSI during these negotiations did not contain a reference date of January 1, 1993. Rather, it pegged the escalation time period to commence on December 1, 1991, 13 months prior to the start of the next contract period. *See* Veenstra Testimony, Trial Tr., at 61. As Mr. Veenstra explained to Mr. Ellis, "[w]ithout a firm Base price effective January 1, 1993, it will be difficult for us to solicit and compare potential competitive offers. We believe that an offer of a firm Base price referenced and effective January 1, 1993, is what is intended by Article VII of the Agreement, and we repeat our request to be provided with this number." Defendant's Exhibit 192.

45. The Court considers Mr. Robert Veenstra's testimony relating to the details of these negotiations with Exxon to be highly credible.

46. Any finding of fact which is determined hereafter to be a conclusion of law shall be treated as a conclusion of law and incorporated into the conclusions of law which follow.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

2. The Court has personal jurisdiction over the parties.

3. Pursuant to 28 U.S.C. § 1391(a), venue in this action is proper in the Southern District of Indiana.

4. By its own terms, the Contract is to be interpreted in accordance with the laws of the State of Indiana.

5. Under the Indiana Uniform Commercial Code, " 'Good faith' in the case of a merchant means honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." Ind.Code § 26–1–2–103(1) (Burns 1992).

6. Exxon did not negotiate in good faith with PSI. Having heard the testimony and evaluated the credibility of the witnesses, it is this Court's judgment that Exxon's representatives were not acting with honesty in their attempts to reach agreement with PSI, most specifically, in their assertions to PSI respecting the market value of their coal. While the concept of "taking commercial advantage of the contractual provisions one has negotiated", *PSI Energy,* No. 93–1088, slip op. at 2 (7th Cir. July 12, 1993), is squarely within the bounds of "good faith" bargaining under the Indiana U.C.C., Exxon exceeded the rules of fair play when it incorporated dishonesty and deception into its negotiating tactics. As stated previously, the statements of Exxon's representatives to PSI regarding the market price of the coal from the Monterey No. 2 Mine were not honest, and it was these statements which formed the basis for their $30 offer. In the words of one commentator, "[d]eception can destroy a contract";[1] by intentionally interjecting material misrepresentations of fact into the negotiations, Exxon was not "honest in fact" as required under the Indiana U.C.C. for "good faith" dealings.

7. In reaching this conclusion concerning "good faith", the Court has been careful to

---

1. Geoffrey M. Peters, *The Use of Lies in Negotiation,* 48 Ohio St. L.J. 1 (1987), *citing,* 12 **S. Williston, A Treatise on the Law of Contracts** § 1486, at 321–22 (3d ed. 1970); *see generally,* Robert S. Summers, *"Good Faith" in General*

*Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 **Va.L.Rev.** 195, 243 (1968) ("A party acts in bad faith when, in an attempt to stall or bluff, he pretends to dispute, not really believing in his position.").

differentiate between the management of the Monterey Coal Company and the management of Exxon Coal and Minerals. From all evidence available to the Court, Monterey appears to have worked very hard to have the No. 2 Mine in a competitive posture by the time the reopener negotiations were in progress. *See* Plaintiff's Exhibit 202, Appendix C, at 3; Plaintiff's Exhibit 226. Unfortunately, Exxon's inartful and deceitful negotiating tactics only succeeded in alienating what should have been a valued customer.

8. Besides the underlying deceit in Exxon's $30 offer to PSI, it was an incomplete offer. The reopener in the Contract was included so that the parties could renegotiate the Price. Without an Exhibit A, it is impossible to calculate a Price under the Contract. *Supra.* Because Exxon's $30 offer failed to include an Exhibit A, PSI was prevented from being able to calculate a Price from that offer. *Supra.*

### CONCLUSION

Exxon's offer of $30 per ton omitted material terms and was not made in good faith. Exxon's "last offer" to PSI for coal from the Monterey No. 2 Mine was therefore $23.266 per ton.

It is so ORDERED.