PSI ENERGY, INC., Plaintiff–Appellee,

v.

EXXON COAL USA, INC., and Exxon Corporation, Defendants– Appellants.

No. 93–3191.

United States Court of Appeals, Seventh Circuit.

Submitted Jan. 3, 1994 *.

Decided Feb. 22, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 21, 1994.**

* An earlier appeal was argued on March 31, 1993, to this panel, which has unanimously decided that further oral argument is unnecessary.

** Judge Cummings and Judge Coffey did not participate in the consideration or decision of this case.

Alan S. Brown, Hugh E. Reynolds, Jr., Thomas L. Davis, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, Donald P. Bogard, Plainfield, IN, for plaintiff-appellee.

William P. Wooden, Katherine L. Shelby, Wooden, McLaughlin & Sterner, Indianapolis, IN, David J. Beck, Amy Murdock, Beck, Redden & Secrest, James K. Wilson, H.G. Hoskins, Exxon Coal and Minerals Co., Houston, TX, Robert Anthony Burgoyne, Keith A. Jones, Fulbright & Jaworski, Washington, DC, Richard J. Wilson, Fulbright & Jaworski, Houston, TX, for defendants-appellants.

Before BAUER, REAVLEY,*** and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Our prior opinion, 991 F.2d 1265 (1993), held that the long-term coal contract between PSI Energy and Exxon Coal USA remains in effect. We remanded so that the district judge could determine the Base price of coal for the period 1993–97. Under the contract, Exxon's "last offer" sets the price for that period. According to Exxon, the "last offer" was a Base of $30 per ton. According to PSI, the $30 offer was incomplete and made in bad faith, and Exxon's bid of $23.266 per ton, matching a rival's proposal in the event it qualified as a "competitive offer" under the contract (which, we held, it did not), is the only suitable "last offer." The district court took additional evidence and held not only that Exxon had negotiated in bad faith but also that its $30 bid omitted essential terms. 831 F.Supp. 1430 (S.D.Ind. 1993). As a result, the court held, the Base during 1993–97 is $23.266 per ton.

PSI raises a jurisdictional question. After January 1, 1993, PSI began accepting deliveries from Black Beauty Coal Company, believing that Exxon's failure to match Black Beauty's offer brought their contract to an end. Not until July 1993, three months after our opinion held that the PSI–Exxon contract remains in force, did PSI resume taking deliveries from Exxon. We issued a supplemental order on July 12, 1993, clarifying the issues to be resolved on remand; this order suggested that the proceedings should include a determination of the damages PSI owes for failure to accept Exxon's coal. The district court did not assess damages on remand, which, PSI believes, makes the order non-final. Cf. *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). When issuing the order of July 12 we were unaware, however, that Exxon had commenced a separate action seeking damages. The district court has wrapped up all of the issues actually presented by this suit, and its decision is appealable.

The contract between PSI and Exxon provides for price renegotiation every five years. If the parties do not reach agreement, the price is set in one of two ways: either Exxon's "last offer" prevails during the ensuing five years, or PSI obtains a "competitive offer," which Exxon may match. If it elects not to match the rival's bid, then the rival gets the business (although PSI may require Exxon to supply coal for an additional two years, while the rival prepares to perform).

*** Hon. Thomas M. Reavley, of the Fifth Circuit, sitting by designation.

Sections 7.03 and 7.05 of the contract describe the mechanism:

[§ 7.03] Either party may require renegotiation of the Base by giving to the other, at any time in the first thirty (30) days of the fourth year of any contract period ..., written notice of its desire to do so. Promptly after the giving of such notice, the parties will commence negotiations to agree upon a new Base to be effective as of commencement of the next contract period. Each party covenants with the other to participate in such negotiations in a good faith effort to reach agreement. If the parties are unable to reach agreement, BUYER will accept SELLER's last offer or present SELLER with a firm, written offer which it has received from another supplier, which it is willing to accept, for the supply of coal called for under the remaining term of this Agreement (herein referred to as a "competitive offer"). It shall also provide SELLER with documentary proof of such offer, and permit SELLER to examine all supporting data and information submitted with the offer. SELLER shall have the right to meet such competitive offer.

If, by the one hundred and eightieth day preceding the end of the contract period in which notice of price renegotiation was given, the parties have agreed upon a new Base, appropriate changes shall be made to the adjustment factors provided in Exhibit "A". The Price of coal effective at the commencement of the next contract period shall be computed from the new Base adjusted under the provisions of Exhibit "A" from the reference date of the new Base. If, by such time, the parties have not reached agreement upon a new Base and SELLER declines to meet a competitive offer submitted by BUYER pursuant to the above provisions, this Agreement shall terminate at the end of the contract period in which notice of price negotiation was given, or at BUYER's election, at the end of the temporary continuance of deliveries as provided for in Section 7.04.

[§ 7.05] It is understood and agreed that the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit "A", and neither party shall inject into such negotiations, as a condition of agreement upon a new Price for the coal, any demand or request that other terms and conditions of this Agreement be altered.

"Base" is the negotiated figure; "Exhibit A" describes adjustments to be made while a Base remains in force. Exhibit A specifies the effects of 12 fluctuating factors, including labor costs, taxes, freight, and changes in the value of money.

■ After the parties reached a stalemate in April 1992, PSI asked Exxon to make a formal "last offer" within the meaning of § 7.03. Exxon offered a Base of $30 per ton, F.O.B. PSI's Gibson generating station, effective January 1, 1993. The offer did not include a copy of the Exhibit A that would be effective on that date, but Exxon promised to update its figures: "The new Base of $30.00 per ton would be subject to adjustments in union welfare, taxes/fees and new laws/regulations between May 1, 1992 and the revised reference date of January 1, 1993." In other words, Exxon would absorb any increases in wages, freight, and the cost of living between April 1992 and January 1993, but changes in taxes and union welfare funds (plus the costs of new laws) from May through December 1992 would lead to adjustments under Exhibit A. The *structure* of Exhibit A would remain the same, but the figures would be updated as of January 1 (or May 1) so that only changes after those dates would alter the delivered price of coal. The offer does not state a price per ton as of January 1, 1993, but it provides the formulas from which the price could be computed once that date arrived. The district court concluded that this combination of a $30 Base plus a promise to update the table of adjustments is not a proper "last offer" under the contract because "[i]t is not possible to calculate the Price under the Contract without an accompanying Exhibit A." 831 F.Supp. at 1438. As a finding of fact—that only Base and Exhibit A put together yield a dollar price—this is unexceptionable. As a construction of the contract, a subject on which our review is plenary (given the parties' agreement that the contract is not ambiguous), it is incorrect.

Section 7.03 does not call for the parties to renegotiate the Price (a defined term, starting with Base and including adjustments per Exhibit A and several other portions of the contract). It provides, instead, that if either party gives the appropriate notice, "the parties will commence negotiations to agree upon a new Base to be effective as of commencement of the next contract period." Section 7.03 adds that once the parties agree on a new Base, "appropriate changes shall be made to the adjustment factors provided in Exhibit 'A'." Although the contract does not say what "appropriate changes" are, the context furnishes the explanation: the parties must update Exhibit A to reflect economic conditions on the date the new Base takes effect. In effect, the Base is the Price at the start of the new contract period; any later change in one of the 12 categories covered by Exhibit A will lead to an adjustment in the Price. Exxon's offer in April 1992 conformed to this approach, with the proviso that Exxon wanted to make adjustments for changes "in union welfare, taxes/fees and new laws/regulations between May 1, 1992 and the revised reference date of January 1, 1993." Exxon offered a Base of $30; PSI's inability to convert this into a Price as of January 1, 1993, until seeing what happened to the three open categories between May and December is neither here nor there under the contract.

Things would have been more complicated had the parties been negotiating some of the formulas in Exhibit A. Although § 7.03 speaks of renegotiating Base, § 7.05 says that "the purpose and intent of Sections 7.01 to 7.04, inclusive, are only to provide for renegotiation of Base and Exhibit 'A'". We may assume, therefore, that PSI was entitled to put on the table a proposal to alter the extent to which Exhibit A translates changes in Exxon's costs into changes in the Price. For example, Part 2 of Exhibit A provides that whenever an adjustment is made under Part 1 for changes in labor costs, "an additional adjustment in the amount of fifty percent (50%) of the adjustment so made, shall be made effective on the same date for changes in the cost of administrative, supervisory, technical, and clerical help at the mine and for changes in SELLER's allocated administrative costs." PSI might have proposed changing this figure to 25% or abolishing it altogether. Then Exxon's offer of a $30 Base plus an Exhibit A updated to January 1, 1993, could have been ambiguous. Did it include PSI's desired change or not? Yet the parties were not negotiating the structure of Exhibit A: Exxon had made it clear that it viewed the subject as non-negotiable, and PSI had not made any concrete proposal concerning the text and structure of Exhibit A. Exxon's offer of April 1992 set a firm Base of $30. It therefore was a "last offer" within the meaning of § 7.03.

The district court recognized this, albeit indirectly. The court's declaratory judgment reads: "Exxon's offer of $30 per ton omitted material terms and was not made in good faith. Accordingly, Exxon's 'last offer' to PSI for coal from the Monterey No. 2 Mine was $23.266 per ton." The district court itself thought that the specification of a Base is sufficient—that the parties can work out for themselves the adjustments needed to update Exhibit A as of January 1, 1993. The parties negotiated the original contract in this fashion, agreeing on a Base and the formulas of Exhibit A more than a year before deliveries began, while leaving its precise numbers to be filled in later. Whatever uncertainties there may be in the computation process do not change the fact that renegotiation under § 7.03 concentrates on Base.

Under § 7.03, "[e]ach party covenants with the other to participate in such negotiations in a good faith effort to reach agreement." Our supplemental order of July 12 remarked:

[T]he Uniform Commercial Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." UCC § 1–201(19). An obligation to negotiate in good faith is not an obligation to be kind to one's trading partner or to refrain from taking commercial advantage of the contractual provisions one has negotiated. See *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990). Nothing we have seen suggests that the contractual reference to "good faith" has a meaning other than the one specified by the UCC.

On remand the district court bypassed PSI's contention that Exxon's bids, approximately $6.75 per ton more than the market price later revealed by the Black Beauty bid, were themselves evidence of "bad faith." PSI had proposed that Exxon sell the coal for as little as $15 per ton, an even greater departure from the Black Beauty bid; when one side is persistently high and the other persistently low, it is hard for either to say that the other's departure demonstrates "bad faith." Nonetheless, the district court held, Exxon deviated from "honesty in fact" and therefore did not live up to its contractual obligation. This is a factual finding, so our review is deferential. *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We conclude, however, that the finding is clearly erroneous.

■ The district court found that Exxon expected the price to be driven down to approximately $20.50 per ton at the mine mouth, 831 F.Supp. at 1437–38, or $25 per ton F.O.B. Gibson station. This finding is amply supported. The market for coal was weak, and for high-sulfur coal (the kind Exxon produced at Monterey No. 2) weaker still. During 1991 and early 1992, spot prices for such coal were $17 to $20 per ton. Exxon itself offered one million tons of this coal per year to Springfield, Illinois, for $20 per ton F.O.B. mine. But the PSI–Exxon contract called for 3 million tons per year, and a firm commitment of that size could fetch a premium, which Exxon's consultant pegged at approximately $2 per ton. Exxon did not reveal these assessments to PSI, which for that matter did not reveal its own internal assessments to Exxon. An obligation to negotiate "in good faith" nixes trickery and certain forms of obduracy, see *Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 594–96 (7th Cir.1991), but it does not require one side in negotiations to reveal its bargaining strategy or its reservation price, to disclose every tidbit that would be of use to the other side, or to refrain from taking advantage of its opportunities. See *Continental Bank, N.A. v. Everett,* 964 F.2d 701, 703–05 (7th Cir.1992); E. Allan Farnsworth, 1 *Contracts* § 3.26c at 341–45 (1990). Not even an employer's legal duty to negotiate in good faith with a union goes so far, see 29 U.S.C. § 158(d) (duty to bargain does not require the making of concessions), and the concept of good faith under the UCC, which applies to this contract, is decidedly more confined than the obligation to bargain in labor law.

The district court's key findings are:

34. Despite what it knew about the market price for coal from the Monterey No. 2 Mine, Exxon repeatedly advised PSI that the market would support a price in excess of $30 delivered to the Gibson Station. See Veenstra Testimony, Hearing Tr., at 60–61; Veenstra Testimony, Trial Tr., at 68–70; Veenstra Testimony, Trial Tr., at 134–135, 136; Veenstra Testimony, Trial Tr., at 191–192, 200.

35. Thus, Exxon's representations to PSI regarding the market price of its coal were knowingly and intentionally inaccurate. See Schwartz Testimony, Hearing Tr., at 25; Veenstra Testimony, Hearing Tr., at 59; Veenstra Testimony, Hearing Tr., at 109–110; Veenstra Testimony, Trial Tr., at 68–70; Veenstra Testimony, Trial Tr., at 134–135, 136; Veenstra Testimony, Trial Tr., at 191–192, 200.

831 F.Supp. at 1438. Exxon's bad faith lay, in other words, in lying to PSI about the market price for coal. The district court did not find that PSI was taken in, or even that there was a risk that PSI would be snookered. A breach of contract without injury— without even a potential for injury—does not lead to the sort of remedy imposed here. (A reduction in Base from $30 to $23.266 per ton is worth about $100 million during 1993–97.) See *Rauch v. Circle Theatre,* 176 Ind.App. 130, 140, 374 N.E.2d 546, 553 (1978); see also *Lincoln National Life Insurance Co. v. NCR Corp.,* 772 F.2d 315, 320–22 (7th Cir.1985). The antecedent problem, however, is that the portions of the record the district court cited offer no support for the conclusion that Exxon told a lie.

All of the district court's references are to testimony concerning four pages of price data Exxon's negotiating team handed to PSI's team (led by Robert Veenstra) during a meeting on March 18, 1992. Exxon's handout listed the price that other public utilities

in the Midwest were paying for coal under long-term contracts. The handout identified approximately 40 contracts by buyer, seller, and price—which ranged from $22.97 to $50.48 per ton, for an average of $31.70. In response to PSI's inquiry, Exxon said that it had assembled these data from forms the public utilities filed with the Federal Energy Regulatory Commission. Veenstra immediately dismissed the figures, remarking that many of the contracts had been negotiated more than a decade ago and were about to expire, while PSI and Exxon had to reach agreement on a new price in light of current conditions. The adjusted price of Exxon's own deliveries to PSI exceeded $38 per ton; PSI knew that that price greatly exceeded the current market and was not impressed by a demonstration that other utilities also had signed long-term contracts during periods of higher prices. As Veenstra testified, the handout did not reflect "very good market intelligence." What we find dispositive, however, is that the handout was accurate in every particular. PSI has never suggested, and the district court did not find, that Exxon doctored the data to make the average price look higher, or even that it selected high-price contracts for inclusion while omitting lower-price contracts. If the district court meant that the data were inaccurate, the finding is clearly erroneous. If, instead, the district court meant that simply handing out a recap of prices being paid under long-term contracts signed years ago—as opposed to prices recently negotiated—establishes bad faith, the conclusion is a legal mistake. Exxon represented the document to be no more than what it was, and PSI was well able to apply the appropriate discount. Cf. *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 512–16 (7th Cir.1989). Similarly, the court was legally mistaken if it believed that distributing accurate data establishes bad faith when the party believes that it will have to settle for less. That would be equivalent to saying that each negotiator must reveal his reservation price rather than take a hard line in bargaining.

 Much of PSI's brief is devoted to an argument that permitting Exxon to use a Base of $30 during the next five years simply isn't *fair* when the market price is about 20%

lower. PSI believes that Exxon should not have maneuvered in an effort to retain a portion of its supramarket price. In commercial transactions, however, the question is not what is fair but what comports with the contract. An obligation to bargain in good faith differs from an obligation to make concessions, as it differs from a fiduciary duty. *Feldman v. Allegheny International, Inc.*, 850 F.2d 1217, 1223 (7th Cir.1988) ("[O]ne cannot characterize self-interest as bad faith. No particular demand in negotiations could be deemed dishonest, even if it seemed outrageous to the other party."); Farnsworth, *Contracts* at 343. Parties may and often do write contracts calling for adjustment to market prices. *These* parties omitted such a provision. Courts frustrate rather than advance the institution of contract when they treat one kind of clause as if it were the other. Contracts allocate risks, and judicial reallocation interferes with not only negotiation but also the economic processes the contracts govern. By enforcing contractual language rather than molding it until the outcome looks more fair *ex post*, courts in the end serve all contracting parties' interests.

Exxon offered to cut more than $8 per ton from the price it was charging in 1991; PSI wanted an even deeper reduction. Each side in this negotiation took a hard-nosed position. Just as Exxon's negotiating position was consistently above market, PSI's was consistently below. This contract contains a mechanism to bridge such a gap: the competitive offer. As our first opinion described, PSI set out to obtain the lowest bid it could, without regard to the structure imposed by the contract. Today might find PSI in a much better position had it solicited bids and negotiated with Exxon's rivals differently. Under the contract, when the parties do not agree and there is no valid competitive offer, the seller's last offer prevails. Not "the market price" in the abstract, but the seller's last offer. Persons negotiating such a contract would understand that this default rule gives the seller the whip hand; it is simultaneously an element of compensation for taking the risk of developing a new mine (which cost Exxon several hundred million dollars, 831 F.Supp. at 1431) and a goad to accommoda-

tion. Knowing that it is apt to pay more than the market price if it fails to come up with a competitive offer, PSI had every incentive to be scrupulous in finding a proper bid. We concluded on the prior appeal that it had failed. Now we quantify the price of that failure: $30 per ton.

REVERSED.