VIACOM INTERNATIONAL INC., et al., Plaintiffs-Appellees,

v.

TANDEM PRODUCTIONS, INC., Defendant-Appellant.

No. 8, Docket 74–1674.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1975.

Decided Dec. 1, 1975.

Otis Pratt Pearsall, New York City (Hughes, Hubbard & Reed, James F. Parver, John A. Donovan, New York City, on the brief), for appellees.

Herman F. Selvin, Beverly Hills, Cal., (Sheldon W. Presser and Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., Shea, Gould, Climenko & Kramer, New York City, on the brief), for appellant.

Before LUMBARD, ANDERSON and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

While the popular television program, "All In The Family" has often depicted controversy, the disputes it has featured generally have been amicably resolved within the time constraints of commercial broadcasting. The present controversy, however, extends through the life of the series and provides none of the comic relief for which the program has become well known. This appeal is taken by Tandem Productions, Inc. (Tandem) from the findings and conclusions of the district court, Gurfein, *J.,* that in July 1970 Columbia Broadcasting System, Inc. (CBS) and Tandem, the producer of "All In The Family," entered into a binding contract that covered broadcast and distribution and syndication of the television series;[1] that the contract was not affected by rules promulgated by the Federal Communications Commission (FCC) that prohibit television networks from obtaining a financial or proprietary interest in any television program produced by a person other than the television network; that CBS could validly assign to Viacom International Inc. (Viacom) the right to distribute and syndicate the program; and that the contract is not subject to the defense that it was in violation of the federal antitrust laws. *Viacom International Inc. v. Tandem Productions, Inc.,* 368 F.Supp. 1264 (S.D.N.Y.1974). We affirm.

### I.

A brief summary of the district court's findings of fact will suffice for present purposes. In May 1970, Tandem and CBS began negotiations for exhibition of "All In The Family."[2] During June–July 1970 the parties reached oral agreement on fifteen essential points, including a grant to CBS of all syndication and distribution rights. 368 F.Supp. at 1268–69. Judge Gurfein concluded that oral agreement on these elements constituted a meeting of the minds on fundamental matters and thus formed a binding agreement by July 1970. Assignability of any of the rights granted in the agreement was not discussed at this time.

---

1. The district court defined the business of distribution and syndication to include "the domestic rerun distribution of television programs after their network run is completed, and the foreign distribution of such programs contemporary with network broadcast." *Viacom International Inc. v. Tandem Productions, Inc.,* 368 F.Supp. 1264, 1266 (S.D.N.Y.1974).

2. The series had been submitted to and refused by at least one other major television network.

The district court found, based on sufficient evidence in the record, that Tandem began production of "All In The Family" immediately after the oral agreement had been reached, 368 F.Supp. at 1270, and the first broadcast took place in January 1971. By October 1970, Tandem had moved into CBS offices and had begun to utilize CBS personnel in the production of the program. On September 25, 1970, CBS circulated a "Memorandum of Agreement" dated "as of July 10, 1970." Paragraph 20 of that Memorandum provided that

> CBS may assign its rights hereunder in full or in part to any person, firm or corporation provided, however, that no such assignment shall relieve CBS of its obligations hereunder.

This same clause, as well as the matters discussed in the oral agreement of the previous summer, appeared in a written agreement between CBS and Tandem that was executed by Tandem some time between July 29 and September 22, 1971, but dated "as of July 10, 1970." CBS signed this agreement at some time between September 22 and September 30, 1971.

This last sequence becomes significant when viewed in light of the FCC's "financial interest" rule. That rule was promulgated early in 1970 to prohibit television networks from acquiring the type of interest in a television program that CBS possessed by virtue of its exclusive license to distribute and syndicate "All In The Family." A series of court challenges delayed the effective date of the rule until July 23, 1971[3] and the rule governs only those television network interests acquired after that date. Thus the validity of CBS's right to distribute and syndicate "All In The Family" depends on whether its contract with Tandem was effective before July 23, 1971.

Up to June 1971, CBS exercised any rights it had in the distribution and syndication of television programs through its subsidiary CBS Enterprises, Inc. In June 1971 CBS requested and obtained FCC approval to merge CBS Enterprises, Inc. into Viacom through a spin-off transaction.[4] CBS then assigned to Viacom whatever rights it possessed to distribute and syndicate television programs, including "All In The Family." The district court found that early in 1971 Tandem had been aware of CBS' intention to assign to Viacom and Tandem claimed that it signed the contract with the assignment clause intact, as above set forth, only after fruitless objections to such an assignment. Tandem apparently felt that its signature on the contract did not resolve the assignment issue, for it entered into a separate agreement with a Canadian distributor to handle foreign distribution of the program. At that point, on July 5, 1973, Viacom brought this action for a declaration of its rights as assignee of an exclusive distributorship.

## II.

We agree with the district court's well-reasoned analysis and its conclusion that there was a binding contract between CBS and Tandem in July 1970. As Judge Gurfein stated, the behavior of CBS and Tandem in producing the show immediately after July 1970 constitutes strong evidence that they considered themselves bound by a contract at that time. 368 F.Supp. at 1270. Tandem argues that this behavior could not create an effective oral agreement because there was at that time no meeting of the minds on the question of program control, a material element of the contract. Judge Gurfein found that the question of program control was not left open but was settled by both parties agreeing that "All In The Family" would ridicule the entire political spectrum. While the written agreement more explicitly delineated certain areas of con-

---

3. See *Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d 470 (2d Cir. 1971).

4. See *In re Columbia Pictures Industries, Inc.*, 30 FCC 2d 9, aff'd sub nom. *Iacopi v. FCC*, 451 F.2d 1142 (9th Cir. 1971).

trol,[5] we cannot say that Judge Gurfein's determination of previous agreement on the general subject of control was clearly erroneous. Although an oral agreement will have no binding effect if it omits a material term of a contemplated subsequent writing, the oral agreement will not be denied legal effect because it does not reflect all the terms to be included in the subsequent writing with complete certainty. *V'Soske v. Barwick,* 404 F.2d 495, 500 (2d Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

Tandem next argues that even if a binding oral agreement did exist after July 1970, the written agreement constituted a novation and discharge of the prior contract. Tandem thus suggests that two separate agreements existed, that Viacom obtained its rights only through the inclusion of the assignment clause in the written contract, and that those rights are void because the written agreement violated the financial interest rule, which became effective before the written agreement was fully executed. In order to constitute a novation, however, a contract must discharge a previous contractual duty, create a new contractual duty, and add a party who neither owed nor was entitled to its performance. Restatement, Contracts § 424. These criteria are not present here. The written contract merely continued and memorialized the parties' rights and obligations as already agreed upon. The addition of an assignment clause would not suffice to create a novation.

Since CBS received the distribution and syndication rights to "All In The Family" as part of a contractual arrangement in force as of July, 1970, the district court was correct in holding that the FCC regulation, effective July 23, 1971, did not affect the legality of CBS's proprietary interest.

Tandem next claims that even if that interest is not vitiated by the FCC regulation, CBS' assignment of the distribution and syndication license transcends the power of assignment granted by the written agreement. Tandem reads the clause, which speaks of the assignment of "rights" and forbids CBS to relinquish its "obligations," as limiting assignment to the "right" to receive the distribution or syndication fees called for by the contract. Tandem contends that CBS was not empowered to delegate its duty actually to distribute or syndicate.[6]

The district court properly explored the parties' intended meaning of the term "assignment" and determined that Tandem signed the written agreement with full knowledge that CBS intended to assign the distribution and syndication rights to Viacom. We find no error in the district court's eminently sensible determination that all parties knew that the assignment of distributorship rights would include the concurrent delegation of distributorship duties.

### III.

The district court's rejection of Tandem's attempt to invalidate the distribution and syndication agreement as

---

**5.** For instance, paragraph 8 of the Memorandum of Agreement dated as of July 10, 1970, provides:

CBS shall have full prior approvals with respect to all key creative elements and of such cast members, if any, who are featured in at least seven programs in the average out of every 13 new programs produced.

**6.** A distinction is to be drawn between the assignment of a party's rights under a contract and a delegation of the party's duties. *Madison Pictures, Inc. v. Chesapeake Inds., Inc.,*

147 N.Y.S.2d 50, 57 (Sup.Ct.1955); Williston, Contracts § 407 (3d ed. 1940). Technically, a party's duties cannot be delegated to another without the consent of the obligee. Unfortunately, attorneys do not always utilize the skills of contract draftsmanship required by the subtle distinction and "assignment" has often been inartfully used to encompass both assignment of rights and delegation of duties. See J. Calamari & J. Perillo, Contracts § 254 (1970); Corbin, Assignment of Contract Rights, 74 U.Pa.L.Rev. 207 (1926).

violative of the antitrust laws presents greater difficulty. Tandem has claimed that CBS conditioned its agreement to broadcast "All In The Family" on a grant of the disputed distribution and syndication rights to CBS. Tandem asserts that the tie-in of distribution and syndication rights to broadcast rights coerced it into relinquishing what it would have preferred to retain. If Tandem could prove these allegations in addition to demonstrating that CBS possessed sufficient economic power with respect to the exhibition of television programs appreciably to restrain free competition for distribution of those programs by tying the services to each other, then the contract would violate section 1 of the Sherman Act, 15 U.S.C. § 1. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The district court allowed Tandem to submit an offer of proof of its claim and assumed that Tandem could prove the allegations of an illegal tying arrangement. Nevertheless, the district court refused to entertain the antitrust defense, relying heavily on *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1958), in which the Supreme Court refused to entertain an antitrust defense in a breach of contract action.

The *Kelly* decision followed a series of opinions in which the Supreme Court had expressed antipathy towards the interposition of antitrust defenses in contract actions.[7] Through various rationales, such as deeming the contracts to be "collateral" to the antitrust violation,[8] the Court has carved out an exception to the general rule against judicial enforcement of contracts that foster illegal ends. In *Kelly,* petitioner, a grower of onions, purchased unwanted onions from respondent upon the latter's representation that he would otherwise sell large quantities of the onions on the futures exchange, thereby depressing their market price. In return for the purchases by petitioner and other growers, respondent promised not to deliver any onions on the futures exchange during that trading session. Petitioner then repudiated the sale and defaulted on part of the purchase price. When respondent brought an action to recover the balance due, petitioner unsuccessfully attempted to defend on the basis that the agreement to buy the onions was part of a conspiracy to fix prices and hence unenforceable. The Supreme Court affirmed;

---

7. In *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902), defendants argued that they were not liable on promissory notes given for the price of pipe because the seller had previously combined with other manufacturers of pipe to establish and control prices. The Court held that there was no necessary legal connection between the sale of goods to defendants and the allegedly illegal arrangement made by plaintiff with other pipe manufacturers. The contracts under which the notes had been given were deemed to be "collateral" to the combination and would not support a defense to paying for what defendants had received.

The Supreme Court also rejected an antitrust defense in *D. R. Wilder Mfg. Co. v. Corn Products Refining Co.,* 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915). In that case, defendant sought to avoid paying the purchase price for glucose by contending that the contract had been executed pursuant to an illegal exclusive dealing arrangement. The Court held that liability on the sale was distinct from the question of illegal combination notwithstanding the possibility that a wrongdoer might receive

some "indirect benefit" or "remote aide" from enforcement of the contract. The Court observed that the contract was not so "inherently" or "intrinsically" illegal as to require courts to refuse to enforce it for fear of compelling a wrongful act. See also *A. B. Small Co. v. Lamborn & Co.,* 267 U.S. 248, 252, 45 S.Ct. 300, 69 L.Ed. 597 (1925).

In *Bruce's Juices v. American Can Co.,* 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), a purchaser of cans contended that promissory notes that it had executed were void because they were given for goods purchased at discriminatory prices in violation of the Robinson-Patman Act, 15 U.S.C. §§ 13, 13a. The Court analyzed the purpose of the antitrust statutes, the intent of the drafters of those statutes, and the functions to be served by avoiding enforcement of illegal contracts. The Court concluded that, in the absence of an intrinsically illegal contract that would be "consummated by the judgment sought," it would not judicially supplement explicit statutory remedies for antitrust violations.

8. *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 551, 22 S.Ct. 431, 46 L.Ed. 679 (1902).

the Court held that the completed agreement to sell onions at a fair price was divisible from the agreement to fix prices. The former constituted "an intelligible economic transaction in itself,"[9] 358 U.S. at 521, 79 S.Ct. at 432, the enforcement of which would not make the courts a party to "the carrying out of the very restraints forbidden by" or "the precise conduct made unlawful by" the Sherman Act. 358 U.S. at 520, 79 S.Ct. at 432.

The Court in *Kelly* limited to its own facts the singular case of *Continental Wall Paper Co. v. Louis Voight & Sons Co.,* 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909), in which the Supreme Court did sustain a defense that the contract in dispute could not be enforced because it arose from a violation of the antitrust laws. In that case, plaintiff, a representative of numerous wallpaper manufacturers, brought suit to recover the balance on an account for merchandise sold and delivered to defendant at excessively high and fixed prices subject to an exclusive dealing arrangement. The Court in *Continental* portrayed the agreement in dispute as an "inherently illegal" element in a scheme for which the manufacturers had combined. The Court therefore affirmed a dismissal of the suit.

The parties have urged us to analyze the claims before us in terms of the standards that have been articulated in the above cases. Thus Viacom argues that any tying arrangement is not "inherently illegal" and that the distribution and syndication agreement constitutes an "intelligible economic transaction." Conversely, Tandem contends that enforcing the contract would aid and abet the "precise conduct made unlawful" by the Sherman Act.

These standards, by themselves, may be too imprecise to be useful in this case. Whether a court classifies a sale as an "intelligible economic transaction in itself" or as "part of . . . any general plan or scheme that the law condemned;" 212 U.S. at 260, 29 S.Ct. at 291, may well depend on how much of the circumstances surrounding the sale the court is willing to consider.[10] Similarly, a determination of whether a contract to purchase a tied product is "inherently invalid" may depend on the court's perception of the contract as a separate or "collateral" entity or as an integral part of an attempt to stifle competition, enforcement of which would effectuate "the precise conduct made unlawful." In *Kelly,* for instance, the Court was willing to view the sale of onions to petitioner as a legal contract severable from an illegal agreement that respondent would withhold his produce from the market. While application of the doctrine of severability in these circumstances is a possibility, it would be difficult to prove that a finding that the two agreements were integrally related was clearly erroneous.

Application of these standards is facilitated by considering the Supreme Court's apparent belief that other policies may override the need to prevent antitrust violations by not enforcing contracts where, as here, the antitrust laws may be vindicated in a separate action. That procedure may be particularly appropriate where, as here, the alleged wrongdoer under the antitrust laws is not a party to the contract in dispute. Rather, Viacom is an independent assignee for value of the rights obtained by CBS. No claim has been made that Viacom either has or has attempted to wield the power necessary to create an illegal tying arrangement.

9. This proposition has been questioned on the ground that the purchase that was the subject of the suit probably would not have been made but for the plaintiff's promise of non-delivery. See Comment, The Defense of Antitrust Illegality in Contract Actions, 27 U.Chi.L. Rev. 758, 765 (1960).

10. The Court in *Kelly* was obviously unwilling to consider any of the background of the transaction before it. See note 9 supra. See also 368 F.Supp. at 1278.

It seems apparent that the overriding consideration which has persuaded the Supreme Court is its concern that the successful interposition of antitrust defenses is too likely to enrich parties who reap the benefits of a contract and then seek to avoid the corresponding burdens. Thus, in *Kelly,* the Court quoted with approval language from Mr. Justice Holmes' dissent in *Continental* advocating that courts adhere to the principle of "preventing people from getting other people's property for nothing when they purport to be buying it." 358 U.S. at 520–21, 79 S.Ct. at 296, quoting 212 U.S. at 271, 29 S.Ct. 280 (Holmes, *J.,* dissenting).[11]

Tandem claims that its arrangement with Viacom presents no possibility of unjust enrichment because no distribution or syndication of "All In The Family" has yet occurred and Tandem has received no payments for these services. Thus, Tandem argues, the reasoning of *Kelly* does not mandate exclusion of the antitrust defense in this case. Some support for this claim may be found in Judge Gurfein's determination that the consideration in the contract for broadcast rights was separate from the consideration for distribution and syndication rights. 368 F.Supp. at 1277. Viacom, however, does point to some evidence in the record suggesting that while payments for distribution and syndication were to be made separately from those for broadcast rights, the level of the payments for broadcast reflected the fact that CBS was receiving distribution and syndication rights. Tandem has also received large sums of money from CBS

for clearing foreign distribution areas. Whether interposition of an antitrust defense would allow Tandem to obtain unjust enrichment by continuing to receive higher fees for broadcast rights without surrendering distribution and syndication rights, therefore, is by no means a clear-cut issue.

In any event, there are additional reasons which convince us that we must relegate Tandem to its antitrust remedies in a separate action. As the First Circuit has noted "such defenses would tend to prolong and complicate contract disputes" and thus convert a facially simple litigation into one involving the complexities of antitrust law. *Dickstein v. duPont,* 443 F.2d 783, 786 (1st Cir. 1971).

An easy toleration of antitrust defenses to contract actions would threaten to involve parties claiming under the contract in litigation so protracted and expensive that they might be coerced into unsatisfactory settlements or be compelled to forego any prosecution of their claims. It is well known that the litigation of antitrust issues is more likely to involve lengthy and expensive proceedings, both before trial and at trial, than any other kind of federal court litigation. The scope of the additional details that would have to be litigated in this case is suggested by a listing of the proof necessary to demonstrate an illegal tying arrangement: (1) two separate and distinct products, a tying product and a tied product; (2) sufficient economic power in the tying market to coerce purchase of the tied product; (3) actual exercise of economic power to force purchase of the tied product; (4) anti-com-

---

11. Lower courts have seized upon this rationale in determining whether to entertain an antitrust defense to a contract action. Thus, in *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753, 768–69 (6th Cir.), cert. denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965), the Sixth Circuit allowed defendant to prove that a contract it had breached was a tying arrangement in violation of the Sherman Act. The court refused to enforce the contract, which required payment by a defunct newspaper of the purchase price of unwanted and unnecessary future services from Associated

Press. In *Atlantic Richfield Co. v. Malco Petroleum, Inc.,* 471 F.2d 1258 (6th Cir. 1972), however, the same court distinguished *Associated Press* as a case involving an executory contract; the court refused to allow defendant to avoid payment on a promissory note that was allegedly given in furtherance of an illegal tying arrangement and for which defendant had received $200,000. Cf. *Medusa Corp. v. Gordon,* 496 F.2d 249 (6th Cir. 1974); *Lewis v. Seanor Coal Co.,* 382 F.2d 437, 441 (3d Cir. 1967), cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968).

petitive effects in the tied market; and (5) involvement of a "not insubstantial" amount of interstate commerce in the tied market. *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1289 (2d Cir.), cert. denied, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972).

In this case, plaintiff, who would suffer most by the prolonged determination of the defense, was not even a party to the alleged illegality. Under these circumstances, it seems proper to limit Tandem to any cause of action it might have against CBS rather than to force Viacom to meet the vagaries of an antitrust defense action.

For all the above reasons, we agree that Judge Gurfein's refusal to consider Tandem's proffered antitrust defense was well advised and supported by guiding precedents.

Affirmed.