**NOVELIS CORP., Plaintiff,**

v.

**ANHEUSER–BUSCH, INC., Defendant.**

**No. 1:06CV2257.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 22, 2008.

Brian J. Howard, Jeremy S. Goldman, David M. Morris, Edward J. Jacobs, William G. McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, Harry D. Cornett, Jr., Hugh M. Stanley, Jr., Scott J. Kelly, Tucker, Ellis & West, Cleveland, OH, Michael L. Waldman, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for Plaintiff.

Michael N. Ungar, Frances F. Goins, Max W. Thomas, Ulmer & Berne, Cleveland, OH, Stephen R. Cook, Howrey, Irvine, CA, Brian D. Wallach, Peter E. Moll, Howrey, Washington, DC, for Defendant.

MEMORANDUM OPINION
AND ORDER

SARA LIOI, District Judge.

This matter comes before the Court upon the motion of Defendant An-

heuser–Busch, Inc. ("A–B") for summary judgment. (Doc. No. 88.) For the reasons that follow A–B's motion is **GRANTED.**[1]

## I. *FACTUAL AND PROCEDURAL HISTORY*

This is a contract dispute. The agreement at issue began in 1987, and set forth the terms by which Plaintiff Novelis Corp. ("Novelis") sold aluminum can sheet to A–B.[2] (Doc. No. 96, Ex. 1.) In June of 2004, the parties amended their prior agreement, and the terms of the amended agreement (the "Agreement") govern the dispute in this case. The Agreement governs the parties' relationship from 2005 through 2009, which included the sale of approximately 587 million pounds of aluminum in 2005, 635 million pounds in 2006, and 659 million pounds in 2007. (*Id;* Doc. No 88, Ex. 49.)

The Agreement provides for a variable price for aluminum can sheet based on a "metal" and a "conversion" component. The metal component of the formula is subject to a price ceiling, such that it is variable only up to the ceiling rate. The parties thus allocated the risk of aluminum prices rising to A–B, so long as prices remained under 85 cents per pound. If such prices did rise above the price ceiling, the burden of the risk shifted to Novelis.

The Agreement also contains a provision (the "b.10 provision"), which provides as follows:

> If during the Term of this Agreement, either party believes that market conditions have changed structurally up or down, in such a manner which causes the current pricing mechanisms to no longer be appropriate, A–B and [Novelis] will meet to discuss a new pricing mechanism with the continued intent to provide competitive pricing to A–B, including without limitation, providing A–B the Contract Discount set forth above. It is the intent of the parties, however, that if the parties, in each party's sole discretion, are unable to reach a mutually acceptable modification to this Agreement, this Agreement as amended shall remain in full force and effect until the expiration or earlier termination hereof.

Novelis invoked the b.10 provision in early 2006 by notifying A–B that Novelis believed a structural change in the market had resulted in a dramatic increase in aluminum prices, thereby rendering a need for modification to the Agreement's pricing mechanism. Novelis alleged that a combination of the rise in energy prices, speculation by hedge funds and other investors, and dramatically increased demand for aluminum from China and other developing countries prompted an unforeseen structural change in the market. Representatives from both parties met in person on January 13, February 22, April 13, May 8, May 10, June 16, June 19, and July 3, 2006. They also held teleconferences on December 15 and 22, 2005, a date in early January 2006, April 18 or 19, May 3, June 1, June 13, and June 20, 2006. (Doc. No. 88, Ex. 42.) Despite this multitude of meetings and discussions, the parties did

---

**1.** A–B submitted a motion to strike much of the evidence upon which Novelis relies in the opposition to summary judgment. While hearsay evidence may not be used to defeat summary judgment, *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir.1999), the Court finds that, even when considering all of Novelis's evidence, summary judgment is warranted in this case.

**2.** Novelis Corporation spun off from its predecessor Alcan Aluminum Corporation in 2005. Although Alcan Aluminum Corporation is listed as the supplier in the Contract, Novelis assumed its rights and obligations under the contract when Novelis spun off in 2005.

not reach an agreement. Novelis at one point proposed that it begin supplying A–B solely with used beverage cans ("UBC"), which would significantly reduce Novelis's losses, but also cause A–B to lose approximately $78 million annually. (Doc. No. 88, King Tr. 87–88.) A–B studied the proposal and advised Novelis during subsequent meetings that A–B was reluctant to adopt it. (Doc. No. 88, Ex. 27.) A–B representatives, in turn, raised the possibility of increasing the price ceiling to help Novelis receive a higher price while also extending the ceiling's temporal duration to provide A–B with the accordant price stability over a longer period. (Doc. No. 88, Walpole Tr. 335.) Novelis rejected this offer and indicated that they "were not interested in a ceiling of any sort." (Doc. No. 88, Ex. 11.) A–B also indicated to Novelis during the meetings that its negotiations were complicated by the fact that it sold aluminum to Pepsi (Doc. No. 96, Ex. 35 at 16133), a fact of which Novelis was aware when the Agreement was drafted. (Doc. No. 88, Ex. 1 at 2149.)

Novelis then brought this suit, claiming in part that A–B breached its contractual duty pursuant to the b.10 provision to "meet to discuss a new pricing mechanism with the continued intent to provide competitive pricing to A–B" in good faith. (Doc. No. 1.) The Amended Complaint claimed breaches of multiple different provisions as set forth below, as well as mutual mistake, commercial impracticability, and unjust enrichment. The Court granted A–B's motion to dismiss the mutual mistake, commercial impracticability and unjust enrichment claims, and the parties proceeded through discovery. (Doc. No. 32.) A–B has now filed a motion for summary judgment on the remaining claims, which is ripe for the Court's determination.

## II. LAW & ANALYSIS

### A. Standard of Review

This Court's consideration of the motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* The party opposing a motion for summary judgment made according to Rule 56 "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The entry of summary judgment is not a disfavored procedural shortcut, but instead is mandated by "the plain language of Rule 56(c) [ . . . ] after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing a motion for summary judgment may do so with "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.* at 324, 106 S.Ct. 2548. The nonmovant must show more than a scintilla of evidence to overcome summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party "must present significant probative evidence in support of its

complaint to defeat the motion for summary judgment." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). In addition, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505. A non-movant is not permitted to rest upon the allegations in the complaint, but must produce affirmative evidence in support of each and every element of each claim. *Id.* 398 U.S. at 150, 90 S.Ct. 1598. In light of this standard, the Court considers Defendant's dispositive motion.[3]

## B. Breach of b.10 Provision

■■■ In Count I, Novelis claims that A–B breached its obligation to meet and discuss a new pricing mechanism in good faith pursuant to the b.10 provision. The Agreement provides that it shall be governed by New York law, which includes the regulation of sales of goods under the Uniform Commercial Code.[4] Under New York law, the ultimate goal of contract interpretation is to construe agreements "in accord with the parties' intent." *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co.*, 375 F.3d 168, 177 (2nd Cir.2004). To establish a claim for breach of contract, a plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Id.*

3. Novelis concedes at the outset of its opposition that A–B is entitled to summary judgment on Count V as it relates to derivatives trading, and on Count VI, a claim that A–B unreasonably increased its volume demands.

4. The parties have agreed, and the Court finds, that New York law applies. The parties have made passing references throughout this litigation and in their summary judgment briefs to Novelis's predecessor, Alcan Aluminum Corporation, as a Canadian Corporation. If Alcan Aluminum Corporation's place of business was in Canada in 2004, such that the contract at issue was between a Canadian company (Novelis's predecessor) and an American company (A–B), it would be governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), not New York law. *See BP Oil Int'l Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir.2003) ("Where parties seek to apply a signatory's domestic law in lieu of the CISG, they must affirmatively opt-out of the CISG."). However, having examined the supplement the Court ordered Novelis to file, the Court is satisfied that Novelis's predecessor was a Texas corporation whose principal place of business was in Ohio as of the Agreement's date of execution in 2004. Because the two contracting parties both were companies whose places of business were in the United States, the CISG does not apply and the parties' choice of New York law will be given force.

 3] Every contract governed by New York law includes an obligation of good faith in its performance. N.Y. U.C.C. § 1–203; *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 300 (2nd Cir.1996). A breach of the covenant of good faith is considered to be a breach of the underlying contract. *See Wolff v. Rare Medium,* 210 F.Supp.2d 490, 497 (S.D.N.Y.2002) (citing *Fasolino Foods Co., Inc., v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992)). A breach of the implied duty of good faith does not substitute for an unsustainable breach of contract action. *Skillgames, LLC v. Brody,* 1 A.D.3d 247, 252, 767 N.Y.S.2d 418 (N.Y.A.D. 1 Dept., 2003). The duty of good faith also "does not create obligations that go beyond those intended and stated in the language of the contract." *Wolff,* 210 F.Supp.2d at 497 (citing *Granite Partners L.P. v. Bear Stearns & Co. Inc.,* 17 F.Supp.2d 275, 305 (S.D.N.Y.1998)); *Gordon v. Nationwide Mut. Ins. Co.,* 30 N.Y.2d 427, 285 N.E.2d 849, 854, 334 N.Y.S.2d 601 (N.Y.1972) ("Bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract.") As such, for purposes of the Agreement, the implied duty of good faith is imposed upon the contractual requirement that the parties meet to discuss a new pricing mechanism with the continued intent to provide competitive pricing to A–B.

In order to interpret the b.10 provision and assess Novelis's claims of breach thereof, the Court first must establish the contours of the provision. The provision does not require an actual structural change in the market to activate the parties' duties. Instead, one party need only believe that the market has changed structurally. Here, there is no question that Novelis believed a structural change oc-

curred, and that the duty was therefore triggered. *Eternity Global,* 375 F.3d at 177 (2nd Cir.2004) (agreements "must be enforced according to the plain meaning of [their] terms."). As such, A–B was required to "meet to discuss a new pricing mechanism with the continued intent to provide competitive pricing to A–B" in good faith.

 ] An obligation to meet to discuss is an even lighter burden than an obligation to negotiate. "Discuss" is defined as "to investigate or examine by argument; to sift the considerations for and against; to debate." OXFORD ENGLISH DICTIONARY (2d ed.1989). In contrast, to "negotiate" is "[t]o hold communication or conference (with another) for the purpose of arranging some matter by mutual agreement; to discuss a matter with a view to some compromise or settlement." *Id.* Thus, while "negotiate" includes a connotation of "compromise or settlement," which could imply a need to give concessions, "discuss" merely includes investigating or examining by argument.[5] In addition, the parties expressly agreed in the b.10 provision that "if the parties, in each party's sole discretion, are unable to reach a mutually acceptable modification to this Agreement, this Agreement as amended shall remain in full force and effect until the expiration or earlier termination hereof," so any argument that A–B was required to agree to a certain alteration to the Agreement directly contradicts the Agreement's terms. *See Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002) ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.").

---

**5.** To the extent that the Court indicated in its decision on the motion to dismiss that this is an agreement to negotiate, the Court has reconsidered that construction.

Consequently, the only question for the Court with regard to Count I is whether the evidence viewed in a light most favorable to Novelis would allow a reasonable jury to find that A–B breached its contractual duty under the b.10 provision to meet to discuss a new pricing mechanism in good faith. The Court finds that it does not.

"In commercial transactions, [ ] the question is not what is fair but what comports with the contract. An obligation to bargain in good faith differs from an obligation to make concessions, as it differs from a fiduciary duty." *PSI Energy v. Exxon Coal USA*, 17 F.3d 969, 974 (7th Cir.1994) (Easterbrook, J. discussing the U.C.C.'s implied duty of good faith). The undisputed evidence shows that A–B met face-to-face eight times with Novelis and held multiple teleconferences to discuss the pricing mechanism. (Doc. 88, Ex. 42.) A–B representatives traveled to meet Novelis, took detailed notes, and engaged in discussions regarding the intricacies of Novelis's problems with the current pricing structure, its objections to further price ceilings, A–B's proposal to raise and extend the price ceiling, possible remedies from Novelis's predecessor corporation, and Novelis's proposal to replace the Agreement's pricing mechanism by providing A–B 100% used beverage cans ("UBC"). (Doc. No. 88, Greenawalt Tr. 324; Doc. 88, Ex. 26.)

In addition, Novelis President Kevin Greenawalt admitted that A–B representatives were engaged and acted in good faith during a meeting he attended. (Greenawalt Tr. at 283–84.) Novelis representative Andrew King conceded that A–B dealt with Novelis in good faith at a meeting in which he participated. (King Tr. 259.) Indeed, one of Novelis's negotiators testified that "we were kind of having discussions, and, you know, [A–B representatives

Cliff Segal and Bob Golden] and [Novelis representative Tom Walpole] and myself would go back and forth in the meetings, talk about various options and opportunities and, you know, we white boarded a few different things." (Doc. No. 88, King Tr. 222–23). King also testified that A–B representative Bob Golden was at the board leading discussions regarding the specific figures involved in potential deals. Novelis would have this Court find that A–B's conduct over this period of more than six months was a huge charade, where it never intended to even consider any alteration to the contract whatsoever. Taking the evidence in a light most favorable to Novelis, the record does not support such a contention.

Novelis argues that because the breach of contract claim involves intent, summary judgment is inappropriate. "While caution must be exercised in granting summary judgment when state of mind is in issue, the summary judgment rule would be rendered sterile if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Nora Beverages v. The Perrier Group of Am., Inc.*, 269 F.3d 114, 125 (2nd Cir.2001) (granting summary judgment where evidence was insufficient to show bad faith in a trademark claim). *See also SuperValu Inc. v. Assoc. Grocers, Inc.*, 428 F.Supp.2d 985, 992 (D.Minn.2006) (granting summary judgment on claim that defendant breached duty of good faith in negotiating); *Arbitron Inc. v. Tralyn Broad., Inc.*, 526 F.Supp.2d 441, 451 (S.D.N.Y.2007) (granting summary judgment as to plaintiff's compliance with implied duty of good faith and fair dealing); *Yonaty v. Amerada Hess Corp.*, No. 3:04–CV–605, 2005 WL 1460411, 2005 U.S. Dist. LEXIS 22429 (N.D.N.Y. June 20, 2005).

■■■■■] Novelis faults A–B for its failure to agree to a complete overhaul of the

contract terms. The parties' intent, however, as illustrated by the Agreement's terms, provided that if "in each party's sole discretion," they were "unable to reach a mutually acceptable modification to [the] Agreement," then the Agreement was to remain "in full force and effect" until its expiration or termination. New York law provides that where an agreement specifically contemplates financial risk allocation and grants discretion to choose to accept or deny a proposal, it is appropriate for the Court to determine that a party has not acted in bad faith as a matter of law. *Halpern Dev. Venture v. Bd. of Trustees*, 247 A.D.2d 584, 584–585, 669 N.Y.S.2d 606 (N.Y.A.D. 2 Dept.1998). *See also U&W Indus. Supply, Inc. v. Martin Marietta Alumina, Inc.*, 34 F.3d 180, 187 (3d Cir.1994) ("The language of the agreement and the expressed intent of the parties always guide the application of the duty of good faith."). "The implied duty of good faith and fair dealing in commercial contracts that [UCC 1–203] imposes controls the manner in which contracting parties carry out the obligations they have undertaken in a contract; it does not," however, "give a court the power to impose additional obligations on one contract-

ing party because a court concludes it is unfair to have the other shoulder a market risk that the former expressly bargained to avoid and the other expressly agreed to assume." [6] *Id.* at 186.

As such, A–B's consideration and rejection of Novelis' offer to provide only UBC to A–B, an offer that would have subjected A–B to losses totaling hundreds of millions of dollars, does not demonstrate a lack of good faith. Novelis took a hard line stance that no price ceilings could be considered. (Doc. No. 88, Ex. 11.) A–B, in turn, expressed reluctance to depart completely from the price ceiling. This does not illustrate a lack of intent to provide competitive pricing to A–B or a lack of good faith on the part of A–B. *See PSI Energy*, 17 F.3d at 974 ("[W]here one side is high and the other persistently low, it is hard for either to say the other's departure demonstrates 'bad faith.' ").[7] Indeed, where the record shows that, as of the negotiations in 2006, all of Novelis's competitors supplying aluminum to A–B provided price ceilings in their contracts with A–B, A–B's intent to maintain some sort of price ceiling in the Agreement is not evidence of a lack of intent to provide competitive pricing to A–B.[8] Further, because the b.10 provision

---

**6.** The Court also notes that the Novelis's proposal to supply A–B with only UBC was not a discussion of a "new pricing mechanism" as the Agreement called for, as it was neither "new" (UBC supply was already covered in the Agreement) nor was it a "pricing mechanism" (it was a discussion of an alteration to type of aluminum supplied, not the Agreement's formula for determining price). Thus, while each party spoke in broad terms about continuing their relationship and seeking solutions, the record reveals that the only time either party actually proposed a new pricing mechanism was when A–B broached the possibility of increasing the ceiling price and extending the length of the Agreement. (Doc. No. 88, Greenawalt Tr. 278.) While not dispositive in favor of either party, this evidence lends even further support to the conclusion

that A–B complied with its limited contractual duty.

**7.** Indeed, employing Novelis's standard for determining good faith, one could argue that it was Novelis who lacked good faith since it refused to accept any proposal that included a price ceiling of any sort.

**8.** The Court finds Novelis's argument that "competitive pricing to A–B" means the parties must seek the market price as it existed in 2006, and that the market at that time demanded no price ceilings so A–B could not suggest the inclusion of any type of price ceiling during the b.10 discussions, unpersuasive. If the parties meant to obligate themselves to seek the market price in their b.10 discussions, they could have so provided in

only required A–B to meet to discuss a new pricing mechanism, not to agree to a new pricing mechanism, the fact that A–B rejected the UBC proposal is not at all probative of the issue.

 Novelis cites evidence indicating that A–B did not believe the market had changed structurally, claiming this shows "dishonesty in fact." "Structural change" is not defined in the contract. A–B's arguments as to whether, in fact, a structural change occurred are not "dishonesty in fact." They are opinions regarding an undefined contractual term. In addition, regardless of whether A–B believed the market had changed structurally, it is undisputed that its representatives still met with Novelis numerous times and considered, discussed and suggested potential changes to the Agreement. Novelis's belief that a structural change had occurred was enough to trigger the provision, regardless of whether one actually had occurred, and A–B was not required to agree with Novelis that such a change had occurred. It was only required to meet in good faith to discuss a new pricing mechanism with the continued intent to provide competitive pricing to A–B, while still retaining its good faith discretion to decline alterations to the Agreement. Good faith must be evaluated in the context of the contract at hand, not in some abstract sense. A–B's subjective belief regarding whether the market had changed structurally thus has no probative value as to whether it met its obligations under the b.10 provision, and the evidence viewed in a light most favorable to Novelis, as previously discussed, shows that it fulfilled that duty.

Novelis also relies upon evidence that A–B sought a "dollar for dollar" transfer in any modification of the Agreement. The undisputed evidence shows that A–B eventually moved away from its "dollar for dollar" position. (Doc. No. 88, Greenawalt Tr. 321, Walpole Tr. 62–63.) Even if it had not, however, it is clear that A–B proposed increasing the price which Novelis could receive if Novelis would agree to extend the duration of this new price ceiling. This effort to aid Novelis and comply with A–B's contractual obligations while not absorbing the $78 million dollar per year loss that would have resulted from Novelis's proposal is not indicative of a lack of good faith. *See PSI Energy v. Exxon Coal USA,* 17 F.3d at 974. Thus, even though it was not required to make concessions to meet and discuss in good faith, A–B's proposal was a concession that further illustrates its good faith.

Novelis also argues that the statements of A–B's representatives regarding its relationship with Pepsi illustrate A–B's lack of good faith. The strongest of these statements is that of A–B representative Bob Golden, as recorded in the notes of Novelis representative Andrew King, that A–B needed to secure the approval of Pepsi before amending the Agreement. (Doc. No. 96, Ex. 35.) Again, the Court finds Novelis's argument lacking. Novelis does not offer a single proposal that A–B rejected because of its relationship with Pepsi. Nor does it identify a single instance where A–B failed to listen or offer proposals because of its relationship with Pepsi. Indeed, the record shows that A–B made a proposal to adjust the contract's pricing

---

the contract. In addition, to require A–B to disregard the contracts it had with its other aluminum suppliers and somehow learn the terms of the confidential contracts other aluminum manufacturers had with A–B's competitors would make little sense. The Con-

tract requires the parties to meet with the "continued intent to provide competitive pricing to A–B." It does not require the continued intent to provide competitive pricing to Novelis.

mechanism, so no reasonable jury could find that Pepsi kept A–B from proposing changes to the Agreement and acting in good faith. Moreover, A–B's unrebutted submissions show that Pepsi never attempted to restrict A–B's discussions with Novelis. (Doc. No. 88, Pepsi 30(b)(6) Tr. 43.) The Court finds, therefore, that evidence that A–B indicated its need, in the abstract, to seek Pepsi's approval prior to changing the contract does not indicate a lack of good faith or a lack of "continued intent to provide competitive pricing to A–B." [9]

Novelis further argues that because A–B inquired into whether Novelis was approaching bankruptcy that A–B was not acting in good faith. A–B's inquiry was apparently prompted by Novelis's repeated representations to A–B throughout their discussions that Novelis was in extreme financial distress. (Doc. No. 88, Brooks Tr. 375–77.) After it concluded that Novelis was not likely to go bankrupt, A–B entertained further discussions in accordance with the b.10 provision. (Doc. No. 96, Ex. 35.) Even viewing the evidence in a light most favorable to Novelis, the Court is not persuaded that merely because A–B questioned Novelis's representations that Novelis was in dire financial condition, A–B was not acting in good faith.

Ultimately, these two international corporations negotiated and renegotiated at arm's length a detailed and complex contract governing hundreds of millions of dollars in sales.[10] If they intended the price to automatically change along with market conditions, they would have omitted the price ceiling and explicitly provided in the contract for an adjustment to the price in accordance with the market conditions. They did nothing of the sort, only obligating themselves to meet and discuss the pricing mechanism upon the belief of one party that the market had changed structurally, while still maintaining good faith discretion to leave the contract in place. Novelis has now sought to avoid the parties' choice of risk allocation under the contract by invoking a provision that required the parties only to comply with a very limited duty. Viewed in a light most favorable to Novelis, the evidence shows that A–B did comply, so summary judgment is appropriate on Count I.[11]

## C. Breach of Confidentiality

In Count IV, Novelis claims that A–B breached the Agreement when its Controller John Kelly ("Kelly") spoke to

---

9. In addition, as discussed *infra,* A–B's contractual commitment to Pepsi only obliged it to discuss "new purchase commitment[s]" with Pepsi. Here, the parties discussed altering the pricing mechanism or adopting a situation where Novelis provided all of the aluminum A–B required in the form of UBC. Neither would have constituted a "new purchase commitment" which would trigger A–B's duty to seek Pepsi's approval.

10. The Court notes that the Agreement also contained a force majeure clause to account for unforeseen events. (Doc. No. 96, Exhibit 1 at "Section IV.") Novelis has chosen not to argue the application of the clause to the facts of the case at hand.

11. Even if summary judgment was not warranted on this entire claim, the Court would still grant summary judgment as to Novelis's ability to recover expectation damages under the claim. Novelis would then be left to seek only reliance damages, which it has not put before the Court. *See Goodstein Constr. Corp. v. City of New York,* 80 N.Y.2d 366, 374, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992) (limiting recovery for breach of obligation to negotiate in good faith to reliance damages and stating, "A party's alleged failure to bargain in good faith is not a but-for cause of plaintiff's lost profits, since even with the best faith on both sides the deal might not have been closed and attributing plaintiff's lost profits to defendant's bad faith may be speculative at best.").

David Charney, a representative of Kensico Capital, a hedge fund that owns stock in Novelis. In the Agreement, the parties agree to keep strictly confidential any information provided pursuant to the Agreement, with few exceptions. It also provides, "The existence of and the terms of this Agreement and the Lease shall, without any further action by the parties, be deemed to constitute confidential information for purposes of this Agreement." The Agreement permits the parties to disclose confidential information to certain designated non-affiliate third parties, including (1) A–B's outside auditors and outside legal counsel; and (2) senior management at PepsiCo, Inc. and Pepsi Bottling Group, Inc., and their respective outside auditors and legal counsel. A breach of this confidentiality provision is defined by the Agreement as a "material default of such party's obligations under this Agreement."

Novelis offers the testimony of Charney, who testified that he knew the contract was a five-year contract renegotiated in the spring of 2004. (Doc. No. 96, Charney Tr. 69.) Charney testified that Kelly was the "source of information on that." (*Id.*) Charney also explained, "I believe he said we renegotiated the contracts in 2004, spring of 2004 and they last for five years," and that he and John Kelly "discussed the renegotiation in the spring of 2004 for a five-year contract." (*Id.* at 84, 70–71.) On the other hand, Charney repeatedly admitted he could not remember if Kelly had been speaking specifically of Novelis, or of contracts A–B had in general. (*Id.* at 389) ("I don't remember if he was referring to can contracts in general or Novelis. That's correct.")

█ The parties' course of performance informs the meaning of the Agreement's confidentiality provision. The Uniform Commercial Code recognizes that "[w]here the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." N.Y. U.C.C. § 2–208. The U.C.C. thus requires a Court to interpret contract terms in light of the parties' course of performance because "the parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." *See* N.Y. U.C.C. § 2–208 cmt. 1.

In this case, Kelly's alleged statement regarding the five-year length of A–B's contracts was similar to Novelis's general comment in its 2005 10-k public filing that "Supply contracts for large global customers generally range from one to five years in length." (Def.Ex.62.) Novelis also revealed the length of the agreement in a published interview (Brooks Tr. 354–55) and to parties who were interested in buying the company. (Brooks Tr. 354–356.) Together, these instances illustrate that the parties did not intend the confidentiality provision to prohibit general statements regarding the term of the parties' agreement.

Moreover, even if the Agreement did prohibit such statements, A–B has more than one supplier of aluminum, and Charney testified that he could not remember whether the allegedly offending comments were made with regard to the parties' Agreement or to agreements that A–B has with its suppliers in general. Charney's testimony thus lacks probative value and is too vague to rise to more than, at best, a mere scintilla of evidence. *Hartsel v. Keys,* 87 F.3d 795, 802 (6th Cir.1996); *Transou v. Electronic Data Systems Corp.,* No. 91–2047, 1993 WL 57498, at *6,

1993 U.S.App. LEXIS 4666, at * 17 (6th Cir. March 4, 1993). Accordingly, the Court finds that no genuine issue of material fact exists as to whether A–B breached the confidentiality provision of the Agreement.

### D. Breach of Anti–Assignment Provision

 In Count V of the First Amended Complaint, Novelis claims that A–B breached the Agreement by delegating to Pepsi its duty to meet and discuss under the b.10 provision. The relevant portion of the Agreement provides, "Neither A–B nor [Novelis] shall have any right, without the prior written approval of the other party which approval shall not be unreasonably withheld, to (i) assign or delegate, in whole or in part, any of its rights, duties or obligations hereunder." In arguing that a delegation occurred, Novelis relies upon the contract between Pepsi and A–B and upon testimony that A–B representatives told Novelis representatives they could not change the Agreement without Pepsi's consent. Under New York law, a "delegation involves the appointment of another to perform one's duties." *Inter Impex S.A.E. v. Comtrade Corp.*, No. 00 Civ. 0133, 2004 WL 2793213, at *3, 2004 U.S. Dist. LEXIS 24431, at *10 (S.D.N.Y. Dec. 6, 2004) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir.1977)). *See also* N.Y. U.C.C. 2–210(1) (to "delegate" is to perform one's duty under a contract through another). Novelis does not offer any evidence that A–B appointed, or even asked, Pepsi to negotiate in its place. Pepsi executives did not attend the b.10 discussions with Novelis. The undisputed evidence shows that A–B offered a proposal that included concessions despite the fact that Pepsi had not offered its approval of any changes to A–B's contract with Novelis. The undisputed evidence also shows that

Pepsi representatives never attempted to restrict A–B's discussions with Novelis. (Doc. No. 88, Pepsi 30(b)(6) Tr. 43.) Consequently, Novelis's reliance upon evidence that A–B executives discussed the situation concerning Novelis with Pepsi has little or no probative value in discerning whether A–B delegated its duty to meet and discuss.

Novelis further claims that A–B's contract with Pepsi provides evidence that A–B improperly delegated its duties under the Agreement's b.10 provision. A–B's contract with Pepsi states that "as AB is actively considering a new purchase commitment to a Cansheet supplier, it will discuss with Pepsi the price mechanism, the volume, warranty and the other terms and conditions applicable to such commitment. [...] A–B may not enter into any commitment that does not satisfy the Acceptable Criteria [separately provided] without the prior approval of Pepsi, which shall not be unreasonably withheld." (Doc. No. 96, Ex. 58 at ¶ 4.5(iv).) This provision's explicit terms limit its application to a "new purchase commitment" considered by A–B. In the case at hand, Novelis has not produced evidence that a "new purchase commitment" ever was considered. Instead, what was contemplated was a modification of the existing agreement. The parties discussed altering the pricing mechanism or adopting a situation where Novelis provided all of the aluminum A–B required in the form of UBC. Neither would have constituted a "new purchase commitment" which would have triggered A–B's duty to receive Pepsi's approval. Further, at the time the parties entered into their agreement, Novelis was aware of A–B's relationship with Pepsi, and that relationship benefited Novelis by creating a greater demand for its product. The terms of the Agreement itself, which allow for the disclosure of confidential in-

formation to Pepsi, illustrate conclusively that the parties did not intend the general antiassignment/delegation provision in the contract to preclude A–B's discussions with Pepsi regarding changes in A–B's ability to supply Pepsi. *See Viacom Int'l Inc. v. Tandem Prods., Inc.*, 526 F.2d 593, 596 (2nd Cir.1975) (contract's anti-assignment provision did not forbid agreement with third party where undisputed evidence showed that plaintiff knew of defendant's intention to assign a portion of its rights at time of contract).

Ultimately, when construed in a light most favorable to Novelis, the evidence does not support a claim for a breach of the anti-delegation provision. Summary judgment on Count V is, therefore, warranted.

### E. Refusal to Pay the Price Demanded for 24–ounce Cansheet

Finally, in Count VIII, Novelis claims A–B refused to pay the full price for 24–ounce can sheet required by the Agreement. The Agreement purports to govern all aluminum can sheet sales from Novelis to A–B. (Doc. No. 88, Ex. 1 at § 3.02.) As explained previously, it provides prices for the aluminum can sheet based upon a metal price and a conversion price. The conversion price is defined as the

"lower of

(x) the Scheduled Conversion Price less the contract discount, or

(y) [Novelis's] lowest weighted-average conversion price for [the respective types of aluminum can stock], charged to any customer using the [can stock] in the United States or Canada, net of all [deductions and discounts].[12]

The "Scheduled Conversion Price" is defined as "the prices set forth in Schedule 3.03(b.4) attached hereto, as adjusted in accordance with Section 3.03(b.6) below." Section 3.03(b.6) provides for an annual adjustment to the prices listed in 3.03(b.4) according to the Producer Price Index for Intermediate Materials, Supplies and Components, as published by the Bureau of Labor Statistics of the U.S. Department of Labor, and also refers to the adjustments in 3.03(b.7). Section 3.03(b.7) provides for adjustments to the Section 3.03(b.4) conversion price for different thicknesses ("gauges") of aluminum based on deviations from a preset base gauge.

Despite the impressive detail to which the Agreement goes in calculating the price of aluminum and the variants thereto, the parties somehow failed to include in Schedule 3.03(b.7) a price for the thicker aluminum can sheet used to make 24–ounce beverage cans. While realizing that the contract did not specify a price, the parties nevertheless proceeded with the buy-sell relationship for 24–ounce can sheet. They established a price for the 24–ounce can sheet based on its deviation from the base gauge in the Agreement. (Doc. No. 96, Ex. 40.) Then, in both 2005 and 2006, in accordance with 3.03(b.6) and (b.7), Novelis calculated the price adjustments for the Scheduled Conversion Prices for all gauges of aluminum and sent them to AB. (Doc. No. 96, Ex. 40, 41, 59.) Both times it sent these adjustments to A–B, it included prices for the thicker aluminum can stock in a second table. (*Id.*) The evidence shows that these adjustments to the 24–ounce can stock were calculated in the same manner as the adjustments for other gauges of aluminum. (Doc. No. 88,

---

12. Apparently the Scheduled Conversion Price has been consistently less than the "lowest weighted-average conversion price [...] charged to any customer," as the parties have focused their briefing on whether the Scheduled Conversion Price applies or the U.C.C.'s gap filler applies, and have not argued that subsection (y) applies.

Ex. 49. at ¶ 6.) Novelis does not dispute this fact.

Despite this course of performance, when the time came for the annual price adjustments for 2007, Novelis decided that it would raise its price for the higher gauge aluminum can sheet 8.5 cents per pound more than the price would have been if it was calculated according to the Agreement's formula. (Doc. No. 96, King Tr., Ex. 3.) A–B refused to pay the extra amount, and Novelis now brings a claim alleging A–B breached the contract by refusing to pay the higher rate. Novelis argues that under the U.C.C., where the parties intend to conclude a contract, as it is undisputed the parties did in this case, and the price term is left open, the price is a "reasonable price at the time of delivery." N.Y. U.C.C. § 2–305(1). Thus, Novelis argues, because the price for the thicker gauge aluminum was not specified explicitly in the schedule attached to the Agreement, it may charge a reasonable price at the time of delivery. Because the price of aluminum has increased, Novelis argues that A–B is obligated to pay the "reasonable price" Novelis set for 2007.

A–B does not dispute that the Agreement does not explicitly state an adjustment for the 24–ounce can sheet. Instead, it argues that the parties' course of performance makes clear that the parties intended the term "Scheduled Conversion Price" to include the same predetermined price and adjustment for 24–ounce can sheet that other gauges received.

 "Generally, a buyer must pay at the contract rate for any goods accepted." ·Hyosung Am. v. Sumagh Textile Co., 137 F.3d 75, 80 (2nd Cir.1998); N.Y. U.C.C. § 2–607(1). Novelis is correct that the U.C.C. calls for a reasonable price at the time of delivery if (a) nothing is said as to price; or (b) the price is left to be agreed by the parties and they fail to

agree; or (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded. N.Y. U.C.C. § 2–305(1). In this case, however, the facts illustrate that the parties did "say something as to price." The parties specified a price differential based on the aluminum gauge's deviation from a base gauge. (Def. Ex. 1 Schedule 3.03(b.7)). They explicitly stated that the Agreement would govern all sales of aluminum from Novelis to A–B, and established a complex pricing scheme intended to cover all of those sales. The U.C.C. recognizes that "the parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." N.Y. U.C.C. § 2–208 cmt. 1. Indeed, section 2–208 provides, "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."

Although the schedule attached to the Agreement does not explicitly state the appropriate price for 24–ounce aluminum, the parties' course of performance illustrates that they chose the corresponding price for such aluminum and then adjusted it twice, once in 2005 and once in 2006, in accordance with the Agreement's provisions. Not only did Novelis "accept or acquiesce" in the computation of the cost of 24–ounce can sheet according to the Scheduled Conversion Price deviations, it computed those prices itself, communicated them to A–B, and accepted those prices in exchange for the 24–ounce can sheet it provided to A–B. Consequently, the Court need not establish a reasonable price un-

der the U.C.C. because the parties' course of performance illustrates that they intended to, and did, establish a price at the time of executing the Agreement.

Novelis characterizes the dispute as one involving a genuine issue of material fact for a jury's determination. According to Novelis, its argument that it merely charged a "reasonable price" each year is one inference that can be drawn from the course of performance. Thus, according to Novelis, A–B's contrary inference that the course of performance established a Scheduled Conversion Price is a factual dispute appropriate for jury resolution. Novelis fails to recognize, however, that the facts of this claim are not in dispute. It is undisputed that the contract does not explicitly state a price for 24–ounce can sheet, that Novelis sent letters in 2005 and 2006 providing prices for the different gauges of aluminum which included 24–ounce can sheet, that these prices were computed in the same manner as the other gauges, and that Novelis attempted in 2007 to charge an extra 8.5 cents per pound for the thicker can sheet. The parties only debate the law that applies to those facts. In this case, U.C.C. § 2–208 mandates that the Court look to the parties' course of performance to construe the terms of the contract. Thus, because the parties consistently exhibited their intent that the price of 24–ounce can sheet was to be calculated in the same manner as the other gauges, the Agreement requires that price.[13] Novelis is not, therefore, entitled to the higher price it demands, and A–B is

entitled to summary judgment on Count VIII.

## III. CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment is **GRANTED** in its entirety. This case is closed.

**IT IS SO ORDERED.**

---

13. Novelis cites an e-mail from one A–B executive to another recommending they acquiesce to the price increase. It does not make any argument, however, as to what legal significance this should have. At any rate, the author's reasoning was that A–B should acquiesce because the agreement did not specifically state a price and A–B was at Novelis's mercy because Novelis is A–B's only supplier of 24–ounce can sheet. The Court has, however, determined that A–B had no legal duty to submit to Novelis's demand because the parties' course of performance establishes that the Agreement includes the lower price for 24–ounce can sheet.